**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SAN LUIS & DELTA-MENDOTA
WATER AUTHORITY; WESTLANDS
WATER DISTRICT,
            *Plaintiffs-Appellants,*

            and

PIXLEY IRRIGATION DISTRICT; LOWER
TULE RIVER IRRIGATION DISTRICT;
TRI-VALLEY WATER DISTRICT; HILLS
VALLEY IRRIGATION DISTRICT; KERN
TULARE WATER DISTRICT; RAG
GULCH WATER DISTRICT; STOCKTON
EAST WATER DISTRICT; FRESNO
COUNTY; TULARE COUNTY,
            *Plaintiffs-Intervenors,*

            and

BAY INSTITUTE OF SAN FRANCISCO;
SAVE SAN FRANCISCO BAY
ASSOCIATION; ENVIRONMENTAL
DEFENSE FUND; NATURAL
RESOURCES DEFENSE COUNCIL;
PACIFIC COAST FEDERATION OF
FISHERMEN'S ASSOCIATIONS;
INSTITUTE FOR FISHERIES RESOURCES;
UNITED ANGLERS OF CALIFORNIA,
            *Plaintiffs-Appellees,*

            v.

UNITED STATES OF AMERICA,
DEPARTMENT OF THE INTERIOR,
BUREAU OF RECLAMATION; KEN
SALAZAR, SECRETARY OF THE
INTERIOR; ROBYN THORSON,
REGIONAL DIRECTOR OF THE UNITED
STATES DEPARTMENT OF THE
INTERIOR FISH AND WILDLIFE
SERVICE, REGION 1; DONALD
GLASER, REGIONAL DIRECTOR,
UNITED STATES DEPARTMENT OF THE
INTERIOR BUREAU OF RECLAMATION,
MID-PACIFIC REGION,
             *Defendants-Appellees.*

No. 09-17594

D.C. No.
CV 97-06140-
OWW

OPINION

Appeal from the United States District Court
for the Eastern District of California
Oliver W. Wanger, United States District Judge, Presiding

Argued and Submitted
March 15, 2011—Davis, California

Filed March 2, 2012

Before: William A. Fletcher and Milan D. Smith, Jr.,
Circuit Judges, and George H. Wu, District Judge.*

Opinion by Judge Wu;
Partial Concurrence and Partial Dissent by Judge M. Smith

---

*The Honorable George H. Wu, United States District Judge for the
Central District of California, sitting by designation.

## COUNSEL

Thomas W. Birmingham, Fresno, California; and Daniel J. O'Hanlon and Andrew P. Tauriainen, Kronick, Moskovitz, Tiedemann & Girard, Sacramento, California, for the plaintiffs-appellants.

Cynthia L. Koehler, Environmental Defense Fund, San Francisco, California; and Paul A. Peters, Hines & Thomas, San Francisco, California; and Katherine S. Poole and Jason Malinsky, Natural Resources Defense Counsel, San Francisco, California, for the plaintiffs-appellees.

Kevin Tanaka, Department of the Interior, Office of Regional Solicitor, Sacramento, California; and Ignacia S. Moreno, Assistant Attorney General, Environmental & Natural Resources Division, and Charles Shockley, Andrew C. Mer-

gen and David S. Shelton, Department of Justice, Washington, D.C., for the defendants-appellees.

## OPINION

WU, District Judge:

"One of the most contentious issues in the western United States is the management of water resources." *Westlands Water Dist. v. U.S. Dep't of Interior*, 337 F.3d 1092, 1100 (9th Cir. 2003) (*"Westlands Water Dist. I"*).

This appeal arises from a long-running conflict which has devolved to the present remaining dispute as to the classification of approximately 9,000 acre feet ("AF") of water released between June 17 through 24 of 2004 from the Nimbus and New Melones reservoirs ("latter June 2004 releases") within California's Central Valley Project (the "CVP" or "Project") by Defendant-Appellee United States Department of the Interior ("Interior"), acting through the United States Bureau of Reclamation (the "Bureau") (collectively, "Federal Defendants" or "Federal Appellees"). Plaintiff-Appellants San Luis & Delta-Mendota Water Authority ("San Luis") and Westlands Water District ("Westlands") (collectively, "Water Agencies" or "Appellants") contend that Interior abused its discretion in failing to apply the latter June 2004 releases against the 800,000 AF of CVP yield especially designated for fish, wildlife, and habitat restoration under section 3406(b)(2) of the Central Valley Project Improvement Act ("CVPIA"), Pub. L. No. 102-575, 106 Stat. 4600, 4715-16 (1992) ("section (b)(2)" or "(b)(2)").

We have jurisdiction pursuant to 28 U.S.C. § 1291. Because we find that the Water Agencies have standing and the accounting which Interior conducted for the latter June 2004 releases did not constitute an abuse of discretion, we

AFFIRM the district court's orders granting summary judgment in favor of the Federal Appellees and against Appellants.[1]

## BACKGROUND

### A.    The Central Valley Project

The CVP is the nation's largest federal water management project. *Central Delta Water Agency v. Bureau of Reclamation*, 452 F.3d 1021, 1023 (9th Cir. 2006) ("*Central Delta II*"); *Orff v. United States*, 358 F.3d 1137, 1141 (9th Cir. 2004). The Central Valley of California extends 450 miles south beginning at the Sacramento Valley, which contains the Sacramento River and its tributaries, and is 100 miles wide on average. *Dugan v. Rank*, 372 U.S. 609, 612 (1963). The Sacramento River runs southward from the Valley's northern edge, through the City of Sacramento, and then onward to the San Francisco Bay and into the Pacific Ocean. *Id.* The southern portion of the Central Valley includes the San Joaquin River, which runs from the Sierra Nevada northeast of Fresno, west to Mendota, and then northwest to join the Sacramento River at the Sacramento-San Joaquin Delta. *Id.* The San Francisco Bay/Sacramento-San Joaquin River Delta Estuary ("Bay-Delta") lies at the convergence of the Sacramento, San Joaquin, and other rivers, and forms the centerpiece of a massive and fragile ecosystem.

One of the initial goals of the CVP was to provide for the transportation of "surplus" waters within the Sacramento Valley to the San Joaquin River and to permit "the waters of the latter river to be diverted to new areas for irrigation and other needs."[2] *Id.* "To accomplish the project's purposes, CVP's

---

[1] *See San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of Interior,* 637 F. Supp. 2d 777 (E.D. Cal. 2008) ("*SL&DM Water Auth. I*"), and, *on motion for reconsideration,* 624 F. Supp. 2d 1197 (E.D. Cal. 2009) ("*SL&DM Water Auth. II*").

[2] "[W]hile over 70 percent of the [state's] stream flow lies north of Sacramento, nearly 80 percent of the demand for water supplies originates in

construction includes a series of many dams, reservoirs, hydropower generating stations, canals, electrical transmission lines, and other infrastructure." *Westlands Water Dist. I*, 337 F.3d at 1095-96 (citing *United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 733 (1950)). The 22 reservoirs within the CVP have a total capacity of approximately 11 million AF, of which 7 million AF is released in an average year. *See* CALIFORNIA DEPARTMENT OF WATER RESOURCES, CALIFORNIA STATE WATER PROJECT AND THE CENTRAL VALLEY PROJECT, http://www.water.ca.gov/swp/cvp.cfm ("*CDWR* Website") (last visited January 30, 2012). "The CVP supplies two hundred water districts, providing water for about thirty million people, irrigating California's most productive agricultural region and generating electricity at nine powerplants." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 861 (9th Cir. 2004).

The CVP is operated by the Bureau. *Westlands Water Dist. I*, 337 F.3d at 1096. The Bureau's control of the CVP water is subject to a plethora of federal statutes and regulations governing many areas including, but not limited to: (1) the release of the CVP yield (*see, e.g.*, section 3406 of the CVPIA), (2) water quality (*see, e.g.*, the Clean Water Act, 33 U.S.C. § 1321), and (3) the impact of the releases on the environment and wildlife (*see, e.g.*, *San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163, 1171 (9th Cir. 2011) ("The 'no-jeopardy' provision in [the Endangered Species Act, 16 U.S.C. § 1536(a)(2)] requires an agency to ensure that any action it takes 'is not likely to jeopardize the continued existence of any endangered or threatened species.' [footnote omitted.]"). Additionally, the Bureau has entered into over

the southern regions of the state." *United States v. State Water Res. Control Bd.*, 182 Cal. App. 3d 82, 98 (1986). "Two-thirds of California households receive at least some of their domestic water from the Bay-Delta, and over seven million acres of highly productive land are irrigated from the same source." *See In re Bay-Delta Programmatic Envtl. Impact Report Coordinated Proceedings*, 43 Cal. 4th 1143, 1153 (2008).

250 long-term contracts for the delivery of CVP water to various agricultural, industrial, and commercial entities in addition to municipal water agencies. *See State Water Res. Control Bd. Cases*, 136 Cal. App. 4th 674, 692 (2006).

Also within the Central Valley is the California State Water Project ("SWP"), which includes storage facilities/reservoirs (holding 5.8 million AF of water and annually delivering an average of 3 million AF), hydroelectric power plants, and about 700 miles of open canals and pipelines. *See CDWR Website*. The SWP is the largest state-built water project in the country and is managed by the California Department of Water Resources ("CDWR"). *Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1122, 1128 (E.D. Cal. 2008). The CVP and SWP share certain facilities and, for over thirty years, have operated in an increasingly coordinated manner pursuant to various agreements between the Bureau and the CDWR.[3] *Id.*; *see also Natural Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 330 (E.D. Cal. 2007).

As described in *State Water Res. Control Bd.*, 182 Cal. App. 3d at 97:

> The [Sacramento-San Joaquin] Delta serves as a conduit for the transfer of water by the statewide water projects. Both the CVP and the SWP divert water from the rivers that flow into the Delta and store the water in reservoirs. Quantities of this stored water are periodically released into the Delta. Pumps situated at the southern edge of the Delta eventually lift the water into canals for transport south to the

---

[3]"The California State Water Resources Control Board grants permits for water appropriation from the CVP. The Bureau appropriates water from various sources and delivers it to permit holders for beneficial uses." *Westlands Water Dist. I*, 337 F.3d at 1096. "Under section 8 of the Reclamation Act of 1902 (43 U.S.C. § 383), the Bureau is required to comply with state law in acquiring water rights for the diversion and storage of water by the CVP." *Id.* at 1101.

farmers of the Central Valley and the municipalities of Southern California. Water which is neither stored nor exported south passes through the Delta where it is used by local farmers, industries and municipalities. The excess flows out into the San Francisco Bay.

The construction and operation of the CVP, along with other stressors, has had a devastating effect upon California's native fish populations, including, in particular, its native salmon. *See In re Bay-Delta Programmatic Envtl. Impact Report Coordinated Proceedings*, 43 Cal. 4th at 1156. Anadromous fish, such as salmon, are particularly sensitive to changes in flow patterns, salinity, temperature and other conditions in and upstream of the Bay-Delta estuary. *See generally Pac. Coast Fed'n of Fishermen's Ass'ns*, 606 F. Supp. 2d at 1218-23. Most of California's salmon face serious risk of extinction.[4] *Id.* at 1250-53.

## B.   The CVPIA

The CVPIA, enacted by Congress in 1992, amended the CVP's authorizing legislation and elevated "mitigation, protection, and restoration of fish and wildlife" to Project purposes on par with irrigation. *See* CVPIA § 3406(a)(1)-(2), 106 Stat. at 4714; *see also O'Neill v. United States*, 50 F.3d 677, 686 (9th Cir. 1995) ("CVPIA marks a shift in reclamation law modifying the priority of water uses."). The overall purposes of the CVPIA are:

> (a) to protect, restore, and enhance fish, wildlife, and associated habitats in the Central Valley and Trinity River basins of California;

---

[4]For example, the winter run chinook salmon "which was listed as threatened in August, 1989, and is now endangered, is under the protective jurisdiction of the National Marine Fisheries Service . . . ." *Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1124 (9th Cir. 1998).

(b) to address impacts of the Central Valley Project on fish, wildlife and associated habitats;

(c) to improve the operational flexibility of the Central Valley Project;

(d) to increase water-related benefits provided by the Central Valley Project to the State of California through expanded use of voluntary water transfers and improved water conservation;

(e) to contribute to the State of California's interim and long-term efforts to protect the San Francisco Bay/Sacramento-San Joaquin Delta Estuary;

(f) to achieve a reasonable balance among competing demands for use of Central Valley Project water, including the requirements of fish and wildlife, agricultural, municipal and industrial and power contractors.

CVPIA § 3402, 106 Stat. at 4706; *Central Delta II*, 452 F.3d at 1023-24.

Section 3406 of the CVPIA deals with "fish, wildlife and habitat restoration." 106 Stat. at 4714. Section 3406(b) states that the Secretary of the Interior ("Secretary") "shall operate the Central Valley Project to meet all obligations under State and Federal law, including but not limited to the Federal Endangered Species Act, 16 U.S.C. § 1531, et seq., and all decisions of the California State Water Resources Control Board establishing conditions on applicable licenses and permits for the project." *Id.*

The Secretary is further charged in section 3406(b)(1) with developing and implementing, within three years of the CVPIA's enactment, "a program which makes all reasonable efforts to ensure that, by the year 2002, natural production of

anadromous fish in Central Valley rivers and streams will be sustainable, on a long-term basis, at levels not less than twice the average levels attained during the period of 1967-1991 . . . ."[5] *Id.* Section 3403(a) defines "anadromous fish" as "those stocks of salmon (including steelhead), striped bass, sturgeon, and American shad that ascend the Sacramento and San Joaquin rivers and their tributaries and the Sacramento-San Joaquin Delta to reproduce after maturing in San Francisco Bay or the Pacific Ocean."[6] *Id.* at 4707.

Section 3406(b)(1)(B) of the CVPIA states that:

> As needed to achieve the goals of this [anadromous fish doubling] program, the Secretary is authorized and directed to modify Central Valley Project operations to provide flows of suitable quality, quantity, and timing to protect all life stages of anadromous fish, except that such flows shall be provided [1] from the quantity of water dedicated to fish, wildlife, and habitat restoration purposes under paragraph (2) of this subsection [§ 3406(b)(2)]; [2] from the water supplies acquired pursuant to paragraph (3) of this subsection [§ 3406(b)(3)]; and [3] from other sources which do not conflict with fulfillment of the Secretary's remaining contractual obligations to provide Central Valley Project water for other authorized purposes.

*Id.* at 4715. Section 3406(b)(2) provides in part that the Secretary shall:

---

[5]This "twice the average levels" provision is sometimes referenced as the "anadromous fish doubling" program. *See*, *e.g.*, *Coal. for a Sustainable Delta v. McCamman*, 725 F. Supp. 2d 1162, 1198 (E.D. Cal. 2010).

[6]"The anadromous fish of principal concern to the management of the Central Valley Project is the Chinook salmon . . . ." *Central Delta Water Agency v. United States*, 306 F.3d 938, 945 n.4 (9th Cir. 2002) ("*Central Delta I*").

> upon enactment of this title[,] dedicate and manage annually eight hundred thousand acre-feet of Central Valley Project yield for [1] the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title; [2] to assist the State of California in its efforts to protect the waters of the San Francisco Bay/Sacramento-San Joaquin Delta Estuary; and [3] to help meet such obligations as may be legally imposed upon the Central Valley Project under State or Federal law following the date of enactment of this title, including but not limited to additional obligations under the Federal Endangered Species Act.

*Id*. at 4715-16;[7] *see also Central Delta I*, 306 F.3d at 945; *Central Delta II*, 452 F.3d at 1024. Section 3406(b)(3) directs the Secretary to develop and implement a program "for the acquisition of a water supply to supplement the quantity of water dedicated to fish and wildlife purposes under [§ 3406(b)(2)]" which utilizes "the following options: improvements in or modifications of the operations of the project; water banking; conservation; [water] transfers; conjunctive use; and temporary and permanent land fallowing, including purchase, lease, and option of water, water rights, and associated agricultural land." 106 Stat. at 4716.

## C.   Outflow Requirements and Objectives

To understand the present dispute, some familiarity is required as to the "outflow" provisions for certain portions of the CVP waterways enacted in part pursuant to the Clean

---

[7]"Central Valley Project yield" is defined as "the [water] delivery capability of the Central Valley Project during the 1928-1934 drought period after fishery, water quality, and other flow and operational requirements imposed by terms and conditions existing in licenses, permits, and other agreements pertaining to the Central Valley Project under applicable State or Federal law existing at the time of enactment of this title have been met." CVPIA § 3406(b)(2), 106 Stat. at 4716.

Water Act. As observed in *PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 704 (1994):

> [T]he complex statutory and regulatory scheme that governs our Nation's waters [commonly known as the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*] . . . implicates both federal and state administrative responsibilities. . . .
> . . . Section 303 of the Act . . . requires each State, subject to federal approval, to institute comprehensive water quality standards establishing water quality goals for all intrastate waters. §§ 1311(b)(1)(C), 1313. . . .
>
>   A state water quality standard "shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." 33 U.S.C. § 1313 (c)(2)(A).

In 1978, the California State Water Resources Control Board ("SWRCB") adopted the "Water Quality Control Plan for the Sacramento-San Joaquin Delta and Suisun Marsh" (the "1978 Plan") that established new water quality standards for salinity control and for fish and wildlife protection in the Delta, which took into account the combined massive effects of the CVP and SWP.[8] *See State Water Res. Control Bd.*, 182

---

[8]As stated in *State Water Res. Control Bd.*, 182 Cal. App. 3d at 107:

The major factor affecting water quality in the Delta is saltwater intrusion. Delta lands, situated at or below sea level, are constantly subject to ocean tidal action. Salt water entering from San Francisco Bay extends well into the Delta, and intrusion of the saline tidal waters is checked only by the natural barrier formed by fresh water flowing out from the Delta.

   But as fresh water was increasingly diverted from the Delta for agricultural, industrial and municipal development, salinity intrusion intensified, particularly during the dry summer months and in years of low precipitation and runoff into the river systems.

Cal. App. 3d at 97-98. As part of that plan, the SWRCB modified the appropriation permits held by the Bureau and the CDWR to require the CVP and the SWP to release more water into the Delta (via flows) and to curtail their exports of water from the Delta (by means of pumping or diversions) as necessary to maintain the water quality standards under the plan. *Id.* at 119. In 1986, certain of those water quality standards were deemed invalid by a California Court of Appeal, *inter alia*, because the SWRCB: (1) improperly considered the protection of purportedly vested water rights in its formulation of the standards, and (2) failed to include in its analysis all sources of water quality degradation such as upstream diverters and polluters. *Id.* at 117-18. In December 1994, "[i]n order to provide ecosystem protection for the Bay-Delta Estuary," various representatives from California state and federal agencies (including the Secretary of the Interior, the Administrator of the Environment Protection Agency, and the Secretary of the California Resources Agency) plus certain interested parties (such as Plaintiff-Appellee Bay Institute of San Francisco, Appellant San Luis, and the Environmental Defense Fund) entered into a compact entitled "Principles for Agreement on Bay-Delta Standards between the State of California and the Federal Government" ("Bay-Delta Accord"), *available at* http://calwater.ca.gov/content/documents/library/ SFBayDeltaAgreement.pdf (last visited January 30, 2012). Bay-Delta Accord at 1, 4-5. That agreement contained detailed *interim* measures for environmental protection and water quality standards for the Bay-Delta.[9] *See In Re Bay-*

_____

    One of the major purposes of the projects was containment of maximum salinity intrusion into the Delta. By storing waters during periods of heavy flow and releasing water during times of low flow, the freshwater barrier could be maintained at a constant level.

The primary purpose underlying the 1978 Plan "was salinity control in order to protect consumptive uses (agricultural, industrial and municipal) of the Delta waters." *Id.* at 115.

[9]The interim measures were "intended to be in force for three years . . . ." Bay-Delta Accord at 1.

*Delta Programmatic Envtl. Impact Report Coordinated Proceedings,* 43 Cal. 4th at 1156. Included therein were water outflow provisions, a new salinity standard, and a spring "pulse flow" requirement on the San Joaquin River at Vernalis.[10] *See Central Valley Water Agency v. United States*, 327 F. Supp. 2d 1180, 1194 (E.D. Cal. 2004). The Bay-Delta Accord also contained language that "[a]ll CVP water provided pursuant to these Principles shall be credited toward the CVP obligation under Section 3406(b)(2) of the Central Valley Project Improvement Act to provide 800,000 acre feet of project yield for specified purposes." Bay-Delta Accord at 3.

In May 1995, the SWRCB adopted the "Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary, 95-1 WR" ("1995 WQCP"), *available at* http://www.swrcb.ca.gov/waterrights/water_issues/programs/ bay_delta/ wq_control_plans/1995wqcp/docs/1995wqcpb.pdf (last visited January 30, 2012). The 1995 WQCP covered certain measures included in the Bay-Delta Accord and provided for the Delta outflow and Vernalis flow objectives that are involved in this case. The 1995 WQCP also identified seventeen "beneficial uses" of CVP/SWP water.[11] Those utilizations

---

[10]As observed in *PUD No. 1*, 511 U.S. at 719:

> In many cases, water quantity is closely related to water quality; a sufficient lowering of the water quantity in a body of water could destroy all of its designated uses, be it for drinking water, recreation, navigation or, as here, as a fishery.

In reference to the southern portion of the Sacramento-San Joaquin Delta, it has been noted that: "In this region water quality degradation is caused not by oceanwater intrusion but mainly by upstream depletions of the San Joaquin River and salt infusion from irrigation waste-water runoff carried by the San Joaquin River." *State Water Res. Control Bd.*, 182 Cal. App. 3d at 121.

[11]Those seventeen uses are: (1) "Municipal and Domestic Supply" — "for community, military, or individual water supply systems including, but not limited to, drinking water supply," (2) "Industrial Service Supply" — "for industrial activities . . . including, but not limited to, mining, cool-

were, in turn, placed into three general categories: (1) "munic-ipal and industrial beneficial uses," (2) "agricultural beneficial uses" and (3) "fish and wildlife beneficial uses" and water quality objectives were then established for each category. *See* 1995 WQCP at 14-15. Certain water quality criteria/objectives overlap two or more of the designated categories. For example, prevention of salinity intrusion is an element as to all three categories. 1995 WQCP at 14.

Water quality objectives for fish and wildlife beneficial uses are set out in Table 3 of the 1995 WQCP. Those require-ments cover: (1) "Delta outflow objectives . . . included for the protection of estuarine habitat for anadromous fishes and other estuarine-dependent species"; (2) "Sacramento and San

ing water supply, hydraulic conveyance, gravel washing, fire protection, and oil well repressurization," (3) "Industrial Process Supply" — "for industrial activities that depend primarily on water quality," (4) "Agricul-tural Supply" — including "farming, horticulture, or ranching" purposes, (5) "Ground Water Recharge," (6) "Navigation," (7) "Water Contact Rec-reation" — such as "swimming, wading, water-skiing, skin and scuba div-ing, surfing, white water activities, fishing, or use of natural hot springs," (8) "Non-Contact Water Recreation" — such as "hiking, beachcombing, camping, boating, tidepool and marine life study, hunting, sightseeing," (9) "Shellfish Harvesting," (10) "Commercial and Sport Fishing," (11) "Warm Freshwater Habitat," (12) "Cold Freshwater Habitat," (13) "Mi-gration of Aquatic Organisms" — "[u]ses of water that support habitats necessary for migration or other temporary activities by aquatic organ-isms, such as anadromous fish," (14) "Spawning, Reproduction, and/or Early Development" — "[u]ses of water that support high quality aquatic habitats suitable for reproduction and early development of fish," (15) "Estuarine Habitat" — "[u]ses of water that support estuarine ecosystems including, but not limited to, preservation or enhancement of estuarine habitats, vegetation, fish, shellfish, or wildlife (e.g., estuarine mammals, waterfowl, shorebirds)," (16) "Wildlife Habitat" — estuarine habitats for "mammals, birds, reptiles, amphibians, and invertebrates," and (17) "Rare, Threatened, or Endangered Species" — [u]ses of water that support habi-tats necessary, at least in part, for the survival and successful maintenance of plant or animal species established under State or federal law as being rare, threatened, or endangered." 1995 WQCP at 12-13.

Joaquin river flow objectives . . . included to provide attraction and transport flows and suitable habitat for various life stages of aquatic organisms, including Delta smelt and chinook salmon"; and (3) "[o]bjectives for export limits . . . included to protect the habitat of estuarine-dependent species by reducing the entrainment of various life stages by the major export pumps in the southern Delta."[12] 1995 WQCP at

(Text continued on page 2289)

---

[12]As delineated in *State Water Res. Control Bd. Cases*, 136 Cal. App. 4th at 701-03:

> [The SWRCB] established various salinity objectives "for the reasonable protection of [agriculture as a beneficial use] from the effects of salinity intrusion and agricultural drainage in the western, interior, and southern Delta." To protect fish and wildlife uses, the [1995 WQCP] established objectives for six parameters: dissolved oxygen, salinity, amounts of Delta outflow, river flows, export limits, and Delta cross-channel gate operation. The plan also included a narrative objective for salmon protection . . .

> 1. *The Southern Delta Salinity Objectives*

> The [SWRCB] adopted various salinity objectives in the plan (expressed as electrical conductivity or EC) to protect agricultural uses in the western, interior, and southern Delta. To protect agricultural uses in the southern Delta, the [SWRCB] adopted salinity objectives to be met at four different locations [including the] San Joaquin River at Airport Way Bridge, Vernalis (the Vernalis salinity objective) . . . . The [1995 WQCP] specified the objectives as 0.7 EC [a measure of electrical conductivity] from April through August and 1.0 EC from September through March . . . .

> 2. *The Delta Outflow Objective*

> Water flow can be regulated as a water quality objective because, as the [SWRCB] explained in the [1995 WQCP], "the rate and quantity of flow . . . are physical properties or characteristics of the water" which "have an impact on the beneficial uses of" water in the Bay-Delta . . . . Thus, a flow objective sets the amount of water that must be flowing in a watercourse at a given time "for the reasonable protection of beneficial uses of [the] water." . . . . Obviously, meeting such an objective may be achieved, among other ways, by reducing the amount of water that upstream water right holders divert from the watercourse or by increasing the amount of water released into the watercourse.

In the 1995 [WQCP], the [SWRCB] explained that "Delta outflow objectives are included for the protection of estuarine habitat for anadromous fishes and other estuarine-dependent species." The parameter for those objectives was the net Delta outflow index (outflow index). The outflow index was a number representing the net amount of water flowing out of the Delta, which was to be calculated by taking the amount of water flowing into the Delta and subtracting from that figure the amount of water being consumed in the Delta and the amount of water being exported from the Delta. For example, every year in September, the [1995 WQCP] required a minimum monthly average outflow index of 3,000 cubic feet per second (cfs) of water to be flowing out of the Delta to protect estuarine habitat within the Delta. ([1995 WQCP], pp. 15, 19, 25.)

3. *The Vernalis Flow Objectives*

As part of the river flow objectives in the [1995 WQCP], the [SWRCB] set minimum monthly average flow rates on the San Joaquin River at Vernalis (the Vernalis flow objectives). The [SWRCB] explained that "Sacramento and San Joaquin river flow objectives are included to provide attraction and transport flows and suitable habitat for various life stages of aquatic organisms, including Delta smelt and chinook salmon." One part of the Vernalis flow objectives was a "pulse" flow during a 31-day period in April and May of each year (the Vernalis pulse flow objective). The [1995 WQCP] called for an average flow rate during that period ranging from 3,110 to 8,620 cfs, depending on the type of water year and on certain salinity measurements. [Footnote omitted.] The [1995 WQCP] also specified that while the default period for the pulse flow was April 15 to May 15, "[t]his time period may be varied based on real-time monitoring. One pulse, or two separate pulses of combined duration equal to the single pulse, should be scheduled to coincide with fish migration in San Joaquin River tributaries and the Delta. The time period for this 31-day flow requirement will be determined by the operations group established under the Framework Agreement." ([1995 WQCP], p. 21, table 3, fn. [18].)

4. *The Salmon Protection Objective*

15. The water quality objectives delineated in Table 3 are established "for the reasonable protection" of the enumerated beneficial uses 11 through 17 which cover uses of water that support: (1) warm or cold "water ecosystems including, but not limited to, preservation or enhancement of aquatic habitats, vegetation, fish or wildlife, including invertebrates"; (2) habitats necessary for reproduction, early development, migration and/or other temporary activities of aquatic organisms including, but not limited to, anadromous fish; and (3) estuarine ecosystems for fish, shellfish, invertebrates, amphibians, reptiles, mammals, and waterfowl, including habitats for rare, threatened or endangered plant or animal species. 1995 WQCP at 12-13, 15. Additionally, the water quality objectives in Table 3 also provide protection for certain beneficial uses that do not involve fish, wildlife, and habitat restoration such as "[u]ses of water for shipping, travel, or other transportation by private, military, or commercial vessels." *Id.*

As to Delta outflow and designated river flows, the 1995 WQCP observed that:

> Unlike water quality objectives for parameters such as dissolved oxygen, temperature, and toxic chemicals, which have threshold levels beyond which adverse impacts to the beneficial uses occur, there are no defined threshold conditions that can be used to set objectives for flows and project operations. Instead, the available information indicates that a continuum of protection exists. Higher flows and

---

The [1995 WQCP] also included a narrative objective for the protection of salmon, which provided: "Water quality conditions shall be maintained, together with [other] measures in the watershed, sufficient to achieve a doubling of natural production of chinook salmon from the average production of 1967-1991, consistent with the provisions of State and federal law." ([1995 WQCP], p. 18, table 3.)

> lower exports provide greater protection for the bulk of estuarine resources up to the limit of unimpaired conditions. Therefore, these objectives must be set based on a subjective determination of the reasonable needs of all of the consumptive and nonconsumptive demands on the waters of the Estuary.

1995 WQCP at 14-15. The 1995 WQCP also contained the following concession regarding salmon protection and the CVPIA's anadromous fish doubling goal: "It is uncertain whether implementation of the numeric objectives in this plan alone will result in achieving the narrative objective for salmon protection." 1995 WQCP at 28.

In response to petitions from the CDWR and the Bureau "to change points of diversion of the Central Valley Project (CVP) and the State Water Project (SWP) in the southern Delta" and "to change the use and purpose of use of the CVP," the SWRCB in March 2000 issued the "Revised Water Right Decision 1641." *See In the Matter of: Implementation of Water Quality Objectives for the San Francisco Bay/Sacramento – San Joaquin Delta Estuary*, *available at* http://www.waterrights. ca.gov/Decisions/D1641rev.pdf ("D-1641"). As explained therein:

> Currently, the authorized places of use in the [Bureau's] water right permits do not all cover the same area. Because the [Bureau] commingles its water from several large reservoirs and diversion works, and because separate permits for these facilities have different requirements, the [Bureau] finds it impractical and infeasible to ensure that water appropriated under a specific permit is delivered only to lands within the place of use specified in the permit. Accordingly, the [Bureau's] practice is to deliver water from any source to any location within its service area without ensuring that water appropri-

ated under a specific permit is delivered only to places specified in the permit . . . . To the extent that the [Bureau] delivers water to places outside a permitted place of use, however, it is operating inconsistently with the terms and conditions of the permit.

D-1641 at 119. The SWRCB approved the consolidation of CVP permit places of use to remedy the Bureau's prior potentially "inconsistent" practice. D-1641 at 119-21.

Additionally, the D-1641 approved, for a period of twelve years, conducting the Vernalis Adaptive Management Plan ("VAMP"), an experimental program to determine the relative impact of changes in flow and export limitations in the San Joaquin River on chinook salmon. *See* D-1641 at 2, 17. The VAMP provides for certain target flows at the Vernalis gage on the San Joaquin River during a 31-day period in April-May and a concomitant potential reduction in SWP and CVP water exports depending upon the amount of available water due to hydrological conditions. *Id.* at 19-20.

A number of challenges were raised to the D-1641. In 2006, on appeal of consolidated cases challenging its adoption, a California Court of Appeal held, *inter alia*, that in adopting portions of the D-1641 the SWRCB erred because it "was not entitled to implement alternate flow objectives agreed to by various interested parties in lieu of the flow objectives actually provided for in the [1995 WQCP] . . . . [and it] failed to adequately implement certain salinity objectives in the [1995 WQCP] and failed to implement the minimum flows necessary to achieve the narrative objective for salmon protection in the [1995 WQCP]." *State Water Res. Control Bd. Cases*, 136 Cal. App. 4th at 690. One of the specific holdings was that "by failing to implement all of the Vernalis flow objectives while the San Joaquin River Agreement is in effect, the [SWRCB] 'fail[ed] to establish the minimum flows necessary to achieve the salmon-doubling standard.' " *Id.* at 777.

D.    Previous Challenges in This Litigation to Interior's
Implementation of CVPIA § 3406(b)(2)

Water allocations under the CVPIA have generated approximately 13 years of protracted litigation in this case, addressing four sequential administrative decisions regarding the implementation of section 3406(b)(2). The case began as a challenge by San Luis to Interior's "Administrative Proposal on Management of Section 3406(b)(2) Water" ("Administrative Proposal"), issued in November 1997, and was later consolidated with a separate challenge brought by various environmental interests, including Plaintiff-Appellees the Bay Institute of San Francisco and others ("Environmental Parties"). The district court issued an April 9, 1999 order granting a partial judgment finding that the Administrative Proposal was deficient. After remand to the agency, Interior released its October 5, 1999 "Decision on Implementation of Section 3406(b)(2) of the Central Valley Project Improvement Act" ("1999 Decision"), setting forth the manner in which it would calculate CVP yield in accordance with the CVPIA and how it would account for (and manage) the use of the 800,000 AF of dedicated yield.

On November 16, 1999, San Luis filed a First Amended Complaint challenging the 1999 Decision. A Second Amended Complaint adding Plaintiff-Appellant Westlands (and updating the challenge to the 1999 Decision) was filed on April 5, 2001. Therein, the Appellants argued that the Federal Defendants were required to credit against the 800,000 AF allocation of CVP yield *all* water used to satisfy any requirements under either the 1995 WQCP or the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq*. The district court agreed, writing in its October 19, 2001 Memorandum Decision that "if it were left to Interior's 'discretion' whether or not to count CVP yield used for such (b)(2) purposes, the annual 800 TAF [thousand acre feet] cap would be illusory." *See San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of Interior*, 236 F.R.D. 491, 494 (E.D. Cal. 2006). In particular,

the district court held that "[a]s a matter of law, [the statutory] language is not ambiguous — water used to meet WQCP or post-CVPIA ESA requirements is an additional (b)(2) purpose and must be charged against the 800 TAF (b)(2) mandate if so used." *Id.* The district court's March 20, 2002 partial judgment certified the (b)(2) accounting issues for appeal pursuant to Fed. R. Civ. P. 54(b). Both the Water Agencies and the Environmental Parties appealed.

During the pendency of that appeal, Interior issued a "final agency action" entitled "Decision on Implementation of Section 3406(b)(2) of the Central Valley Project Improvement Act — May 9, 2003" ("May 2003 Decision") which set out "the calculation of CVP yield . . . , the method of accounting for use of (b)(2) water, and procedures for management and accountability for the dedicated (b)(2) water." The May 2003 Decision incorporated the parts of the district court's ruling regarding the mandatory treatment of water uses under the 1995 WQCP and/or post-CVPIA ESA requirements as chargeable against the dedicated (b)(2) yield.[13]

---

[13]The May 2003 Decision stated:

> Interior will continue to fulfill the commitment to meet the 1995 Bay-Delta WQCP obligations (SWRCB D1641). These costs will be accounted as the [sic] increase in releases and decrease in exports, compared to releases and exports that would have resulted from simulated CVP baseline operations during the same period. The CVP will be operated in accordance with the WQCP obligations and ESA obligations. Interior will account for the total amount of CVP water costs associated with meeting the WQCP obligations and ESA obligations imposed after enactment of CVPIA against the annual (b)(2) allocation, up to the balance of (b)(2) water remaining at the time the cost is incurred.

In addressing public comments to an earlier draft of the decision, the Federal Defendants specifically observed that "only meeting the WQCP and post-1992 ESA requirements may not be sufficient to meet the anadromous fish doubling goal and other restoration purposes and measures included in the CVPIA." *See SL&DM Water Auth. I*, 637 F. Supp. 2d at 781 n.1.

On June 3, 2003, we issued a memorandum opinion in *Bay Institute of San Francisco v. United States*, 66 Fed. Appx. 734 (9th Cir. 2003), affirming in part and reversing in part the district court's March 2002 partial judgment. In particular, we overruled the district court's decision regarding Interior's lack of discretion in accounting for water used for any (b)(2) purpose (such as for 1995 WQCP or post-CVPIA ESA requirements) against the 800,000 AF of Project yield.[14]

On December 17, 2003, the Bureau's Regional Director and the United States Fish and Wildlife Service's ("USFWS") California/Nevada Operations Manager issued a joint memorandum on "Guidance for Implementation of Section 3406(b)(2) of the CVPIA" ("2003 Guidance Memo") which was intended to "supplement[ ] the May 9, 2003 Decision, in light of the June 3, 2003 Ninth Circuit Ruling." The Guidance Memo noted that:

> The May 9, 2003 Decision specifically provides for a target of up to 200,000 acre-feet of use in the October through January period, primarily for high priority fish and wildlife uses. Moreover, actions taken pursuant to the 1995 Water Quality Control Plan and State Water Resources Control Board Decision D-1641 ("the 1995 WQCP") involve the dedication and management of Central Valley Project yield for long-term fishery beneficial use and protection. Such actions are not taken to help meet agricultural or municipal and industrial water quality standards that are set forth in the 1995 WQCP. Most of the fishery beneficial uses and objectives under the 1995 WQCP and in Reclamation's water rights permits help fulfill the fish, wildlife, and habitat restoration purposes

---

[14]To the extent that Interior had incorporated into its May 2003 Decision the district court's position which *required* counting all 1995 WQCP and post-CVPIA ESA releases against the (b)(2) yield, it would have been in error.

and measures authorized by Section 3406(b). Consistent with the June 3, 2003 Ninth Circuit decision, much of the (b)(2) water that is dedicated and managed annually to help meet fishery beneficial use and protection objectives of the 1995 WQCP serves Section 3406(b)(2)'s "primary purpose" of fish, wildlife, and habitat restoration.

Also, under the 2003 Guidance Memo, the agencies agreed to start each year "with targets of up to 300,000 acre feet of (b)(2) water annually for high priority fish and wildlife actions" and "up to 500,000 acre-feet of (b)(2) water annually to help meet WQCP and ESA obligations." However, the agencies recognized that "[t]his guidance does not establish caps but assures that priority actions are carefully weighed against the standards in the WQCP designed for fish and wildlife benefits." Further, the 2003 Guidance Memo provided that "if the projected and/or realized WQCP/ESA costs for the accounting year exceed the 500,000 acre-feet of (b)(2) water, the [USFWS] and [the Bureau] will confer to determine the best course of action."

On January 23, 2004, we issued an amended decision in *Bay Institute of San Francisco v. United States*, 87 Fed. Appx. 637 (9th Cir. 2004) ("*Bay Institute*").[15] On the issue of Interior's discretion not to charge CVP yield used for secondary (b)(2) purposes against the 800,000 AF account, we stated:

> The district court erred in concluding that Interior lacks discretion to refrain from crediting the amount

---

[15]The amended decision made two specific changes to the memorandum opinion. It modified the first sentence of paragraph 5 to emphasize that Interior has the "discretion to refrain from crediting the amount of Project yield actually used for any (b)(2) purpose against the designated 800,000 acre feet of Project yield"; and it replaced the final sentence of paragraph 5 to make clear that such discretion is necessary to implement Interior's mandate "to give effect to the hierarchy of purposes established in Section 3406(b)(2)." *Bay Institute*, 87 Fed. Appx. at 638-*69.*

of Project yield actually used for any (b)(2) purpose against the designated 800,000 acre feet of Project yield. To hold otherwise would defeat the primary purpose for which the 800,000 acre feet were designated — fish, wildlife, and habitat restoration. Section 3406(b)(2) provides that the "primary purpose" to which the 800,000 acre feet should be dedicated is the implementation of "fish, wildlife, and habitat restoration purposes authorized by this title . . . [sic]" Section 3406(b)(2) also provides that the 800,000 acre feet may be used to "help" meet obligations under the Endangered Species Act and to "assist" in meeting water quality standards. If Interior were required to deduct some or all the water it uses for water quality and Endangered Species Act purposes from the (b)(2) dedication, the water needed for implementation of the Improvement Act's restoration mandate could be relegated to a secondary role, or perhaps no role at all. Such a scenario would directly conflict with the Interior's mandate to give effect to the hierarchy of purposes established in Section 3406(b)(2).

*Id.* at 639-40. Interior reviewed and considered our amended decision when undertaking subsequent (b)(2) actions, but made no changes to its 2003 Guidance Memo or other policy documents. *See SL&DM Water Auth. I,* 637 F. Supp. 2d at 783.

### E.   The 2004 (b)(2) Accounting

Interior set the CVP (b)(2) accounting year to run from October 1 through September 30 because that time frame is consistent with the life cycle of most salmon and steelhead that spawn in the Central Valley rivers. *See* May 2003 Decision at 4. Typically, the fall and early winter are spawning periods for those anadromous fish whose eggs hatch in approximately two months. *Id.* After hatching, the salmonid

fry spend their early life stages in nearby rearing habitats. During April through June, "fishery actions target the emigration habitat for juvenile salmon as they migrate downstream, through the Delta and to the ocean." *Id.*

As described in *San Luis Unit Food Producers v. United States*, 772 F. Supp. 2d 1210, 1218 (E.D. Cal. 2011):

> Each year [the Bureau] projects the amount of water that will be available based upon reservoir storage, precipitation, runoff forecasts, and other indices . . . . Based on that projection and after taking into account the amount of water required to satisfy statutory and regulatory requirements, [the Bureau] determines the amount of water that can be delivered and allocated to its various contractors, including irrigation districts, municipal and industrial users, and wildlife refuges . . . . [The Bureau's] water service contracts . . . contain shortage provisions that specifically recite that [the Bureau] is not liable for shortages caused by compliance with legal obligations.

In October 2003, the Bureau proposed a series of prognostications of CVP operations for the upcoming 2004 year which included *inter alia* two hydrology scenarios — one where there was a 90% chance that the forecast would be exceeded ("90% numbers") and one where there was a 50% chance of its being exceeded ("50% numbers"). The Bureau also developed projections of CVP operations under: (1) pre-1992 conditions ("baseline forecast"), (2) under the provisions of the SWRCB's D-1641 ("water quality control plan forecast"), and (3) under the requirements of the 1995 WQCP and other (b)(2) mandated actions ("(b)(2) forecast"). Initial projected monthly and annual CVP water costs were estimated by running and comparing the forecasts against the 90% and 50% numbers. Each subsequent month, the Bureau updated the actual hydrology and CVP operations data and, in turn, developed a new set of the 90% and 50% numbers. The actual

(b)(2) accounting was based on a comparison of the daily CVP operations, including the (b)(2) actions, to the daily hypothetical CVP operations under the baseline (pre-1992) conditions.

Interior initially summarized its use of CVP water for (b)(2) purposes during 2004 in a document entitled "Preliminary b(2) Accounting, Oct '03 – Sep '04" ("Preliminary Accounting"). The Preliminary Accounting shows that spring of 2004 was a period of heavy use for (b)(2) water. In April, the (b)(2) account incurred charges to implement the VAMP and to meet Vernalis flow objectives. In addition, due to the unexpected volume of storms in the middle of March 2004, the water costs of meeting the 1995 WQCP requirements relating to the location of "X2"[16] during April were much higher than Interior had anticipated.[17] May 2004 was another period of heavy use due to upstream releases, VAMP implementation, and releases from New Melones Reservoir.

Much of the administrative record in this case consists of technical charts and compilations showing constantly updated forecasts and estimates of CVP operations and (b)(2) accounting. As the Federal Appellees pointed out in their brief, there is no single document that comprises a "record of decision" for the 2004 Water Year. However, certain documents prepared during and at the end of the 2004 Water Year — particularly a chart entitled "Water Year 2004 Fishery Action Costs" ("2004 Year-End Accounting") — illustrate the

---

[16]The Delta outflow objective dictates the site of the Delta's salinity mixing zone, designated as "X2," the location of which is measured in kilometers from the Golden Gate Bridge. *See* D-1641 at 10 n.11. As with the Vernalis Salinity Standard, salinity for purposes of X2 is currently determined by a measurement of the electrical conductivity of the water. *See id.*

[17]The March 90% forecast showed a potential water quality control plan cost of about 1,000 AF for CVP releases and about 76,000 AF for export actions. In the April 90% forecast, the projected costs were 317,000 AF for CVP releases and 115,000 for CVP export actions.

actions that Interior implemented for that year. The 2004 Year-End Accounting reflects 799,700 AF used for (b)(2) purposes and 158,900 AF used for other "Non-(b)(2) Fishery Actions."

As Interior realized that it would reach the 800,000 AF limit on (b)(2) water dedications in late May or early June, Interior (in consultation with the USFWS) considered various accounting scenarios to deal with water released to meet 1995 WQCP and/or post-1992 requirements. In addition, Interior began taking actions to reduce other (b)(2) uses and sought to utilize Environmental Water Account ("EWA") assets to manage the annual (b)(2) operations and accounting.[18] Ultimately, Interior established three categories of use to account for CVP releases of water under its various statutory responsibilities: (1) "PRIMARY PURPOSE Fish Actions," (2) "WQCP Actions that contribute to PRIMARY PURPOSE," and (3) "WQCP/ESA Actions that contribute to SECONDARY PURPOSE." From June 17 to 30, 2004, Interior made releases from the Nimbus Reservoir on the American River, from the New Melones Reservoir on the Stanislaus River (which flows into the San Joaquin River near Vernalis), and in Clear Creek.

The 2004 Year-End Accounting reflects that, during the relevant period, the Clear Creek releases were charged to the (b)(2) account, and they are not directly involved in this appeal. The Nimbus releases and a portion of the New Melones releases, however, were not charged against the (b)(2)

---

[18]"The EWA provides water for the protection and recovery of fish beyond that which would be available through the existing baseline of regulatory protection related to project operations. The EWA buys water from willing sellers or diverts surplus water when safe for fish, then banks, stores, transfers and releases it as needed to protect fish and compensate water users for deferred diversions." *Kempthorne*, 506 F. Supp. 2d at 340. EWA water may be used either directly for the protection of fish "or to compensate project water users for reduced exports at the project pumps." *Id*. at 358.

account because they were ostensibly made to meet general Delta outflow and Vernalis flow standards for June. A total of 5,500 AF was released from the Nimbus Reservoir in the latter portion of June 2004 in order to meet the 1995 WQCP Delta outflow standard. Similarly, in that period, there was a total of 17,600 AF released from the New Melones Reservoir Complex at the Goodwin Dam in order to meet the San Joaquin River flow requirements at Vernalis. The Nimbus release and 3,500 AF of the New Melones release were assigned in Interior's accounting to the third category of "WQCP/ESA Actions that contribute to SECONDARY PURPOSE." Because they were categorized as "Secondary Purpose" actions, Interior refrained from charging 5,500 AF of the Nimbus release and 3,500 AF of the New Melones release against the 800,000 AF (b)(2) account allocated for CVPIA's restoration mandate. The sum of the those figures is the contested 9,000 AF at issue in this appeal.

### F.   Motions for Summary Judgment

Following the 2004 Water Year, the Water Agencies sought and obtained leave to file a Supplemental Complaint. *See San Luis & Delta-Mendota Water Auth. v. U. S. Dep't of Interior*, 236 F.R.D. 491 (E.D. Cal. 2006). The Supplemental Complaint alleged that Interior's 2004 (b)(2) accounting was arbitrary, capricious, an abuse of discretion, and contrary to law. In November 2007, following the Federal Appellees' preparing and filing of the Administrative Record for the 2004 (b)(2) accounting year, the Water Agencies and Federal Defendants each filed cross-motions for summary judgment. The Water Agencies argued in their motion that Interior unlawfully classified certain actions and water releases in late June and in August/September 2004 as "Non-(b)(2) Fishery Actions." The August/September 2004 releases are not at issue in this appeal.

On September 19, 2008, the district court issued its decision on the cross-motions, granting the Water Agencies'

motion for summary judgment as to the August/September 2004 actions[19] and granting the Federal Defendants' cross-summary judgment motion as to the latter June 2004 releases. *SL&DM Water Auth. I*, 637 F. Supp. 2d 806-07. Accurately characterizing the Water Agencies' challenge as concerning "the *scope* of Interior's discretion, rather than whether Interior has any discretion at all," *id.* at 795 n.8 (the latter question having been resolved by the previous appeal), the district court engaged in a detailed analysis of the 2004 allotments and concluded that Interior had not abused its discretion as to its treatment of the latter June 2004 releases. *Id.* at 803-04, 806-07.

In their summary judgment motion, the Water Agencies, while acknowledging that Interior enjoys *some* discretion not to charge WQCP/ESA actions against the (b)(2) yield, nevertheless argued that this discretion is extremely limited. Under the Water Agencies' interpretations of the CVPIA and of this court's June 2003 *Bay Institute* decision, any water used to meet WQCP and/or ESA purposes must be counted against the (b)(2) yield unless doing so would not serve any fish, wildlife, and habitat restoration purposes, or if counting the water toward the 800,000 AF limit would "significantly impair" section (b)(2)'s primary restoration purposes. *See id.* at 795. The Water Agencies further urged that any water used pursuant to the WQCP or the ESA to further fish and wildlife restoration necessarily "serves the primary purpose and effectuates the hierarchy of purposes set in section 3406(b)(2)," and so must be counted against the (b)(2) allotment.[20] *Id.*

---

[19]In regards to the August/September 2004 actions, the district court held that Interior had failed to explain its reasoning for its accounting for that period, and "[t]his is a failure of proof, which makes its decision arbitrary and capricious." 637 F. Supp. 2d. at 806.

[20]The district court responded to this contention in part by referencing language from the 2003 Guidance Memo. As stated by the court:

The Federal Appellees proffered a much broader interpretation of the scope of Interior's discretion as to CVP water used to satisfy the 1995 WQCP or post-1992 ESA requirements. They argued that the ruling in *Bay Institute* "must be read as a command to Interior to ensure that it exercises its discretion in a manner that will not frustrate the primary purpose of fish, wildlife, and habitat restoration." *Id.* at 796. The Environmental Parties' position approximately tracked that of the Federal Appellees, except that they also expressly argued that the sole primary purpose of the CVPIA is anadromous fish doubling. *Id.*

The district court rejected the Environmental Parties' suggestion that the "fish doubling" requirement set forth in section 3406(b)(2) was "the only restoration activity that should be considered a component of the 'primary purpose.' " *Id.* at 798. It also, however, rejected the Water Agencies' argument that the reference to the ESA and WQCP requirements in the CVPIA reflects Congress's understanding that these requirements must always be considered part of the "primary purpose" of the CVPIA. *See id.* at 797. Ultimately, the district court held that "a plain language reading of the primary purpose language . . . suggests that Congress intended only actions specifically authorized by the CVPIA to be considered 'primary purpose' measures." *Id.* at 799. Further, it determined that "[t]he 'primary purpose' includes . . . . water dedi-

---

[T]he December 2003 Guidance's statement that "most" of the water dedicated to meet the fishery and beneficial use and protection objectives of the WQCP also serve the CVPIA's "primary purpose," impliedly acknowledges that some portion of water dedicated to meet WQCP goals does not serve the primary purpose. Elsewhere in the administrative record, Interior specifically stated that "only meeting the WQCP and post-1992 ESA requirements may not be sufficient to meet the anadromous fish doubling goal and other restoration purposes and measures included in CVPIA."

*SL&DM Water Auth. I*, 637 F. Supp. 2d at 802 n.15.

cated to accomplish the anadromous fish doubling goal set forth in section 3406(b)(1), but also includes water needed to accomplish any of the other specifically enumerated programs listed in section 3406(b)" that could conceivably affect water releases or flows (*i.e.*, 3406(b)(4), (5), (8), (9), (12), (18) & (19)).[21] *Id.* at 799-800. Noting the "potential for overlap" between primary purpose measures and actions taken pursuant to the 1995 WQCP and/or the ESA, and applying our prior ruling in *Bay Institute*, the district court articulated the following precept:

> [I]f an action taken under the WQCP and/or the ESA predominantly contributes to one of the primary purpose programs (*e.g.*, fish doubling), it must be counted toward the 800,000 AF limit. Interior retains the discretion not to count other secondary actions, so long as doing so is necessary to give effect to the hierarchy of purposes.

---

[21] Section 3406(b)(4) deals with the development of "a program to mitigate for fishery impacts associated with operations of the Tracy Pumping Plant"; section 3406(b)(5) covers the development of "a program to mitigate for fishery impacts resulting from operations of the Contra Costa Canal Plant No. 1"; section 3406(b)(8) provides for making "use of short pulses of increased water flows to increase the survival of migrating anadromous fish moving into and through the Sacramento-San Joaquin Delta and Central Valley rivers and streams"; section 3406(b)(9) calls for eliminating, "to the extent possible, losses of anadromous fish due to flow fluctuations caused by any Central Valley Project storage or re-regulating facility"; section 3406(b)(12) provides for "flows to allow sufficient spawning, incubation, rearing, and outmigration for salmon and steelhead from Whiskeytown Dam"; section 3406(b)(18) directs the Secretary to, "if requested by the State of California, assist in developing and implementing management measures to restore the striped bass fishery of the Bay-Delta estuary"; and section 3406(b)(19) calls for maintaining "minimum carryover storage at Sacramento and Trinity River reservoirs to protect and restore the anadromous fish" in those rivers). 106 Stat. at 4717-19.

The district court noted that the "remaining provisions in section 3406(b) do not direct Interior to undertake specific restoration activities that could impact water releases and deliveries." *SL&DM Water Auth. I*, 637 F. Supp. 2d at 798 n.11.

*Id.* at 801-02.

The district court found that its conclusion (that the CVPIA does not require that all ESA and WQCP compliance actions count towards a primary purpose) was "reinforced" by the fact that section (b)(2) itself delineates "multiple priorities."[22] *Id.* at 797. As the court stated:

> Primacy is given to those "fish, wildlife, and habitat restoration purposes and measures authorized by [the CVPIA]." Thereafter, Interior is directed by the statute "to assist" the State in its "efforts to protect the

---

[22]Ultimately, while it rejected the view that only actions that predominantly contributed to the specific goal of "fish doubling" had to be considered primary purpose actions, the district court initially went on to take a rather cryptic view of this court's *Bay Institute* ruling, stating:

> The Ninth Circuit gave predominant and exclusive effect to (b)(2)'s primary purpose by interpreting Interior's discretion as unlimited, to not count toward the 800 TAF account, ESA, WQCP, and related uses of CVP yield. This leaves Interior with unlimited discretion to undermine other statutory non-environmental CVP water purposes. This does not appear to be a fair or reasonable interpretation of the CVPIA. The Environmental Plaintiffs responsibly recognized this at oral arguments, when they avowed that they do not seek to use all CVP annual yield for environmental purposes.

*SL&DM Water Auth. I*, 637 F. Supp. 2d at 806. That view was not reiterated in its opinion on the motion for reconsideration. *SL&DM Water Auth. II*, 624 F. Supp. 2d 777.

It is not true, of course, that Interior's discretion is unlimited. First, the referenced discretion pertains to the allocation among competing uses for the 800,000 AF in the (b)(2) account. Second, at the very least, it is constrained by the limiting language in the CVPIA itself that requires the CVP "to meet all obligations under State and Federal law," as this court has acknowledged. *See Central Delta II*, 452 F.3d at 1024. Finally, section 3406(b)(1)(C) directs the Secretary to ensure that dual use (*i.e.*, the same dedication of water to meet CVPIA fish and wildlife purposes and to meet WQCP/ESA requirements) is accomplished "to the greatest degree practicable." 106 Stat. at 4715.

> waters of the San Francisco Bay Sacramento-San Joaquin Delta Estuary," and "to help" meet obligations imposed upon the CVP under State and Federal law, "including but not limited to additional obligations under the Federal Endangered Species Act . . . ."

*Id.* at 797-98 (quoting § 3406(b)(2)).

Applying its stated rule, the district court then considered whether Interior had abused its discretion in its accounting of the latter June 2004 releases. In doing so, the district court acknowledged that it was forced to look beyond the administrative record. It observed:

> [N]one of the guidance documents presented in the Administrative Record directly identify or explain the procedures Interior must follow either in a "normal" (b)(2) year or an "exceptional" one in which the 800,000 AF limit may need to be exceeded. The May 9, 2008 [sic] Decision comes the closest, stating:
>
>> Interior will account for the total amount of CVP water costs associated with meeting the WQCP obligations and ESA obligations imposed after enactment of CVPIA against the annual (b)(2) allocation, up to the balance of (b)(2) water remaining at the time the cost is incurred.
>
> This Decision, however, predates the Ninth Circuit's ruling on the issue.

*Id.* at 803 (citation omitted). The district court further noted that the Federal Defendants had themselves asserted that there was "no formal administrative decision in this case to which *Chevron* deference is owed" and that, accordingly, the parties

had stipulated "to allow for the submission of expert declarations to help explain the contents of this 'rather unusual administrative record to the court.' " *Id.* (citation omitted).

The supplemental materials included the declarations of Roger Guinee (the Water Operations Division Chief for the USFWS's Water and Fishery Resources Program) and Paul E. Fujitani (the Chief of the Water Operations Division in the Bureau's Central Valley Operations Office). Those declarations stated that: (1) the latter June 2004 Nimbus and New Melones releases were specifically implemented to respectively meet the WQCP Delta outflow and the Vernalis flow requirements, and (2) the USFWS had *not* recommended that the Bureau increase flow releases in June 2004 on the American River for primary fish restoration purposes pursuant to section (b)(2). Utilizing those submissions, the district court concluded that Interior did not abuse its discretion by failing to deduct the additional 9,000 AF of CVP yield released in the latter portion of June of 2004 from the 800,000 AF (b)(2) account. This conclusion, however, was based in part on the district court's finding (later withdrawn) that, because the 1995 WQCP numeric standards "do not specifically identify an intent to support the fish doubling goal (or any other specifically-enumerated 3406(b) program)," actions taken to satisfy those standards do not " 'predominantly' contribute to primary purpose programs." *Id.* at 804.

### G.    Motion for Reconsideration

The Water Agencies moved for reconsideration of the district court's decision regarding Interior's June 2004 allocation of the 9,000 AF to "Non-(b)(2) Fishery Actions." On May 14, 2009, the district court granted that motion, but did not change its overall conclusion that Interior had not abused its discretion. *See SL&DM Water Auth. II*, 624 F. Supp. 2d at 1217. Although the district court reversed its finding that the SWRCB did not intend "for the numeric flow standards in the 1995 WQCP to contribute toward the narrative fish doubling

goal in the WQCP," it noted that its reversal on that point did not "resolve whether water used for WQCP purposes also is predominantly used for primary CVPIA 3406(b)(2) purposes." *Id.* at 1217. As to that question, the court conceded that "[t]he summary judgment record contained very little specific information pertaining to this issue." *Id.* at 1214.

In the meantime, the parties had submitted new declarations with the motion for reconsideration, including one from Christina Swanson, Ph.D., a fisheries biologist with the Bay Institute of San Francisco, whose earlier declaration also had been considered in connection with the summary judgment motions. *Id.* at 1215. Dr. Swanson stated that the Delta outflow objective primarily benefits non-salmonid fish species such as white sturgeon, bay shrimp, *Crangon franciscorum*, longfin smelt, and Sacramento splittail.[23] *Id.* Dr. Swanson further testified that the releases at issue could not have benefitted salmon because, in late June 2004, most of the juvenile salmon were gone from the San Joaquin River and the agencies were not even sampling for salmon in the river at that time. *Id.* at 1216. In addition, Guinee in his supplemental declaration stated that the latter June 2004 Nimbus releases were "specifically implemented to support CVP export pumping" and "to meet Delta demands." Absent evidence that they were intended to *predominantly* benefit anadromous fish as opposed to other fish species, "and in light of the fact" that an Environmental Impact Report performed in connection with the 1995 WQCP indicated that the Delta outflow standard was intended to benefit multiple fish species (as well as other animals), the district court again found no abuse of discretion in connection with Interior's accounting for the latter June 2004 releases made to satisfy the Delta outflow objective. *Id.* at 1215-16.

---

[23]As noted by the district court, however, sturgeon (unlike bay shrimp, *Crangon franciscorum*, longfin smelt, and Sacramento splittail) is "arguably" an anadromous fish under the CVPIA's definition. *See SL&DM Water Auth. II*, 624 F. Supp. 2d at 1215 n.4.

As to the water released from the New Melones facility to comply with the Vernalis flow standard, the court noted that there was a dispute among the parties' experts regarding the possible reasons for the release and "predominant use of [the] water." *See id.* at 1216-17. Nevertheless, the court noted:

> As to such a decision on a subject, water accounting, inherently within the agency's discretion and expertise, the deferential standard favoring the agency's decision is not overcome. Based on the totality of the information available to the Bureau at the time, including the fact that the Vernalis flow standard is designed to serve multiple purposes, not just anadromous fish doubling, coupled with the fact that there were no salmon present in the San Joaquin system in late June 2004, the Bureau exercised discretion and did not abuse it in not counting water released to comply with the Vernalis flow standard toward the (b)(2) account. Even though the Bureau's rationale was not clearly articulated in the record, a court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." [*Nat'l Ass'n of* ] *Home Builders* [*v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007)].

*Id.* at 1217.

## STANDARD OF REVIEW

We review *de novo* a district court's grant of summary judgment. *Nolan v. Heald College*, 551 F.3d 1148, 1153 (9th Cir. 2009). The district court's interpretation and application of federal statutes are also reviewed *de novo*, as is its determination on the issue of standing. *Levine v. Vilsack*, 587 F.3d 986, 991 (9th Cir. 2009).

Because the CVPIA contains no provision for judicial review, the Administrative Procedure Act ("APA") governs

the review of Interior's challenged actions in this case. 5 U.S.C. §§ 701-06; *see also United States v. Bean*, 537 U.S. 71, 77 (2002) ("[I]n the absence of a statutorily defined standard of review for [an agency's] action under [a federal statute], the APA supplies the applicable standard."). Under the APA, an administrative action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "We will sustain an agency action if the agency has articulated a rational connection between the facts found and the conclusions made." *Pac. Coast Fed'n of Fishermen's Ass'ns v. U. S. Bureau of Reclamation*, 426 F.3d 1082, 1090 (9th Cir. 2005) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Although a decision may be upheld if the agency's reasoning may be reasonably inferred, it is impermissible to "infer an agency's reasoning from mere silence." *Id.* at 1091 (quoting *Beno v. Shalala*, 30 F.3d 1057, 1073-74 (9th Cir. 1994)). Reversal of the agency action is appropriate when "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* at 1090 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

## ANALYSIS

### A. Standing

As delineated by Appellants in their Opening Brief, the "issue presented for review" herein is:

> Whether Interior's method of accounting for Central Valley Project ("CVP") yield dedicated and managed under section 3406(b)(2) of the CVPIA during June, 2004, is arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law because it excluded water dedicated and managed to benefit fishery resources and habitat pursuant to numerical Delta outflow and San Joaquin River flow objectives set forth in the 1995 Water Quality Control Plan ("1995 WQCP") against the 800,000 acre-feet limit imposed by Congress.

Because the Federal Appellees have renewed their challenge of the Water Agencies' standing to raise this issue, we initially turn to that jurisdictional requirement.

Where, as here, a plaintiff seeks to challenge a federal agency's action under the APA, it must satisfy both the constitutional elements for standing under Article III as well as the statutory requirements for "standing under the APA." *See Public Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1019-20 (9th Cir. 2003), *rev'd on other grounds*, 541 U.S. 752 (2004); *Fair v. EPA*, 795 F.2d 851, 853-54 (9th Cir. 1986).

**[1]** To establish Article III standing: (1) a "plaintiff must have suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of — the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotation marks omitted); *see also Salazar*, 638 F.3d at 1169. The burden of establishing the elements of standing falls upon the party asserting federal jurisdiction. *Lujan*, 504 U.S. at 561. The Water Agencies have Article III standing to challenge the accounting methods employed by Interior with respect to the allocation of (b)(2) water resources in 2004 because Interior's

accounting decision arguably resulted in reduced water deliveries to them.

To establish its injury in fact, Westland claims that it has a beneficial interest in water stored and delivered by the CVP.[24] As stated in *Westlands Water Dist. I:*

> Westlands entered into a contract with the Bureau for water from the San Luis Unit of the CVP, which diverts water from the Sacramento-San Joaquin River Delta via the Delta-Mendota Canal. Westlands is the largest contractor for water from the San Luis Unit, *Firebaugh Canal Co. v. United States*, 203 F.3d 568, 572 (9th Cir. 2000), with a contractual entitlement to purchase 900,000 acre feet of water annually, *O'Neill v. United States*, 50 F.3d 677, 680 (9th Cir. 1995).

337 F.3d at 1097. The contract between Westlands and the Bureau recognizes that:

> There may occur at times during any year a shortage in the quantity of water available for furnishing to the District through and by means of the Project . . . . In any year in which there may occur a shortage from any cause, the United States reserves the right to apportion the available water supply among the District and others entitled under the then existing contracts to receive water from the San Luis Unit . . . .

---

[24]As noted in *O'Neill*, 50 F.3d at 680:

In 1963, the United States entered into a long-term water service contract with Westlands Water District pursuant to federal reclamation statutes. Under this contract, the United States agreed to construct the San Luis Unit of the Federal Central Valley Project ("CVP") in part to furnish water to the Westlands Water District.

*Id.* at 1097-98. We have held that "an unavailability of water resulting from the mandates of valid legislation constitutes a shortage by reason of 'any other causes.' " *Id.* at 1101 (citing *O'Neill*, 50 F.3d at 684).

**[2]** Westlands presented undisputed evidence that, for most of the 2004 water year, allocations of CVP yield to agricultural service contractors south of the Delta (which would include the Water Agencies here) were at 65% of contracted amounts. In response to that shortfall, Westlands had to purchase alternative supplies and its landowner customers had to pump groundwater.[25] This court has recognized that "the loss of affordable irrigation water for . . . agricultural lands" is an injury in fact, *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1086 (9th Cir. 2003), and that the adverse consequences flowing from a reduction in water delivery are "concrete and particularized" and "actual or imminent." *Salazar*, 638 F.3d at 1169-70.

**[3]** The Water Agencies also contend that they face the threat of future injury because Interior claims discretion to refrain from counting prospective releases utilizing CVP yield (that are required by the 1995 WQCP or the ESA) against the (b)(2) account. "[T]he possibility of future injury may be sufficient to confer standing on plaintiffs; threatened injury constitutes 'injury in fact.' " *Central Delta I*, 306 F.3d at 947 (citing *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000)). The Water Agencies have demonstrated that they face a "significant risk" that their water allocations will be reduced in the future as a result of the Federal Appellees' (b)(2) accounting decisions regarding releases pursuant to the 1995 WQCP and/or the ESA in operating the CVP. *Id.* at 948. Because the Water Agencies have shown both an actual injury and a threat of future injury, we

---

[25]Westlands indicates that, in 2004, ground-pumping and other alternative sources had to supply over 350,000 AF of water in lieu of CVP yield.

conclude that the first element of Article III standing is satisfied.

The Federal Appellees do not specifically contest the Water Agencies' showing as to their injury in fact, but instead primarily focus on the second factor (*i.e.*, causation). They contend that the Water Agencies have not proffered any evidence that the CVP's "less than demand" allocation to Westlands or the other south-of-Delta agricultural contractors was in fact caused by Interior's actual accounting determinations that the Water Agencies challenge in this lawsuit.

**[4]** The causation element requires that the injury be "fairly traceable to the challenged action of the defendant" and not "the result of the independent action of some third party not before the court." *Tyler v. Cuomo*, 236 F.3d 1124, 1132 (9th Cir. 2000). The district court, addressing the Federal Appellees' causation argument, noted that, even though the Water Agencies "do not specifically explain how Interior's 2004 Water Year accounting actions resulted in reduced water deliveries," the Federal Appellees themselves "accounted for these actions as reductions from CVP yield . . . ." *SL&DM Water Auth. I*, 637 F. Supp. 2d at 787-88. In challenging Appellants' ability to demonstrate causation, Interior attempts to characterize the district court's observation, that "[i]f this reduction of CVP annual yield did not cause losses to CVP contractors, Federal Defendants have not explained why," *id.* at 788, as an improper attempt to shift the burden on the issue of standing. As noted at oral argument, however, the allocation of CVP water is a zero-sum game. Thus, if Project yield is used for one purpose, it reduces the available water for other purposes. The conclusion that an unexpected and sizable reduction in available CVP yield resulted in decreased water deliveries to CVP contractors is a natural and plausible one. The CVPIA specifically provides that "[i]f the quantity of water dedicated under this paragraph, or any portion thereof, is not needed for the purposes of this section, based on a finding by the Secretary, the Secretary is autho-

rized to make such water available for other project purposes." CVPIA, § 3406(b)(2)(D), 106 Stat. at 4716. Had Interior accounted for the 9,000 AF in question as water used in service of section 3406(b)(2)'s primary purpose, more water would have been available for allocation to CVP contractors, including those represented in this lawsuit.

[5] Causation is also demonstrated by the methodology that the Bureau uses in its delivery of water allocations and its agreements with agricultural contractors such as the Water Agencies herein. Under the contracts, when there is a shortage of water "from any cause" to deliver the full specified amounts of CVP yield, the Bureau is permitted to apportion the available water among all of the parties that are entitled to the water under the existing contracts. While hydrological conditions such as rainfall, temperature, snow pack, reservoir levels, conveyance losses, and other factors will affect the amount of CVP yield, actions by government bodies can also impact the quantity of water available for distribution. As recognized in *Westlands Water Dist. I*, 337 F.3d at 1101, the mandates of valid legislation can cause a shortage which would fall within the "from any cause" provision. Thus, the set aside of 800,000 AF in the CVPIA reduces the quantity of available water for delivery to the south-of-Delta agricultural contractors.[26] Additionally, the Federal Defendants' failure to account for particular releases as being within the (b)(2) 800,000 AF would potentially allow them to circumvent the legislative directive in the CVPIA that, "to the greatest degree practicable, the specific quantities of yield dedicated to and managed for fish and wildlife purposes under this title are credited against any additional obligations of the Central Val-

---

[26]It is not only the amount of water that is of concern but also the timing of when the water is available. For example, as noted in *Central Delta I*, 306 F.3d at 944: "Water that is used for fishery habitats is released into the Stanislaus River primarily in April, May and October. Plaintiffs contend that as more water is released for fish during this period, less water is available for releases during the drier periods of the year . . . ."

ley Project which may be imposed by the State of California following the enactment of this title . . . ." CVPIA § 3406(b)(1)(C), 106 Stat. at 4715. A failure to properly account for the releases would cause additional shortfalls of available yield, which in turn would cause the Bureau to proportionally reduce the amounts of water for delivery to agricultural contractors.[27]

[6] Finally, Appellees also do not dispute that the relief sought in this case — *i.e.*, (1) a declaration that Federal Defendants do not have discretion to refrain from counting fish-related actions taken pursuant to the 1995 WQCP or post-

---

[27]Interior basically conceded this point in the D-1641 promulgation process. The Bureau had petitioned the SWRCB to be allowed "to change and consolidate places of use and purposes of use of water under certain permits of the CVP." *See* D-1641 at 115-30. Westlands objected to the change arguing that it would cause injury to CVP contractors because the Bureau would reduce the amount of water delivered under the contracts and divert water for other purposes such as meeting the requirements of the Federal Endangered Species Act and the CVPIA. *Id.* at 123. Interior countered by asserting:

> The CVP contractors, including [Westlands], are not entitled to a fixed supply of water in every year under their contracts. [Interior] pointed out that the contracts and the provisions of the *Barcellos* [*and Wolfson, Inc. v. Westlands Water Dist.*, Civ. No. F-79-106 EDP (E.D. Cal. 1993)] judgment expressly allow the [Bureau] to reduce deliveries because of a shortage resulting from *any cause*. [Interior] interprets the contract as allowing it to reduce water deliveries to its contractors when it is required to do so under federal laws.
>
> . . . .
>
> [Interior] argues that SWRCB should approve the petitioned changes so that in satisfying its obligations under federal law, the [Bureau] operates consistently with its water right permits. In effect, [Interior] is saying that it is required by federal law to operate in a way that causes shortages of water deliveries to its contractors, and that it will continued to do so whether or not the SWRCB approves the petitioned changes in purpose of use.

*Id.* at 124-25 (footnote omitted).

CVPIA ESA requirements toward the (b)(2) allocation, and (2) an injunction prohibiting Federal Defendants from failing to count such actions against the (b)(2) allocation in the future — would redress the Water Agencies' alleged injury. There is, potentially, a concern about redressability and/or mootness, because the Water Agencies are not seeking damages or any remedy that would undo actions taken in the 2004 water year. However, their claims fall within the "capable of repetition yet evading review" exception to mootness. *See, e.g.*, *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007) (noting established exception to mootness where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.") (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)). If, indeed, Interior has misinterpreted the scope of its discretion not to charge water it uses for WQCP and/or ESA purposes against the (b)(2) account, then, arguably, the Water Agencies would sustain a new injury in every year such use exceeds the 800,000 AF allotment or the agency incorrectly accounts for uses of the dedicated (b)(2) yield and the Water Agencies receive less than their contractual allotment. Thus, it is jurisdictionally appropriate to review the latter June 2004 accounting decisions.

**[7]** Because the Water Agencies have met the three requirements under *Lujan*, they have Article III standing to challenge the accounting methods employed by Interior for the 2004 (b)(2) water year.

The Water Agencies also have statutory standing under the APA. Section 10(a) of the APA provides: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. As to the first element, Interior's decisions for the 2004 (b)(2) accounting year clearly are "agency actions." As to the second factor, in order to be "adversely affected or aggrieved"

within the meaning of a statute, "the plaintiff must establish that the injury he complains of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990). As the district court noted, "one of the stated purposes of the CVPIA is to 'achieve a reasonable balance among competing demands for the use of [CVP] water, including the requirements of fish and wildlife, agricultural, municipal and industrial and power contractors.' CVPIA § 3402(f)." *SL&DM Water Auth. I*, 637 F. Supp. 2d at 792. Characterizing the Water Agencies' alleged injury as "reduced water deliveries to agricultural, municipal, and industrial contractors," the district court correctly concluded that the injury fell "within the zone of interest of the CVPIA." *Id.*

### B.    Whether Interior Abused Its Discretion

In support of their contention that Interior's decision not to charge the latter June 2004 releases against the (b)(2) account was an abuse of discretion, the Water Agencies argue that: (1) "Section 3406(b)(2) provides Interior with limited discretion regarding accounting of water used for WQCP purposes"; (2) "The 'primary purpose' actions under section 3406(b)(2) include all actions serving the purposes and measures authorized by the CVPIA"; (3) "Allowing Interior discretion to exclude water dedicated to WQCP or other uses from the (b)(2) account would eviscerate the 800,000 acre-feet limit and conflict with other CVPIA provisions"; and (4) "Until it was faced with the 2004 accounting problem, Interior understood that it was required to count the 'non-B2 fishery actions' taken from June 17, 2004, through June 30, 2004, against the 800,000 acre-feet limit of section 3406(b)(2)." These arguments are unavailing.

First, no party or court currently contends that Interior possesses unlimited discretion regarding its accounting of the 800,000 AF of CVP yield which it manages under section

3406(b)(2) of the CVPIA. Here, the dispute revolves around the scope or limits of the discretion as set out in the enabling legislation.

Initially, in 1999, the Water Agencies took the position that the Federal Defendants had to charge all CVP yield used to satisfy any requirements under the 1995 WQCP or ESA against the 800,000 AF allocation. The district court agreed in its 2001 decision. We reversed. We held that, while (b)(2) water may be used to help meet obligations under the ESA or water quality standards in the 1995 WQCP, "[i]f Interior were required to deduct some or all of the water it uses for water quality and Endangered Species Act purposes from the (b)(2) dedication, the water needed for implementation of the Improvement Act's restoration mandate could be relegated to a secondary role, or perhaps no role at all. Such a scenario would directly conflict with Interior's mandate to give effect to the hierarchy of purposes established in Section 3406(b)(2)." *Bay Institute*, 87 Fed. Appx. at 640.

**[8]** Upon remand and further litigation, the district court held that the "primary purpose" language in section 3406(b)(2) refers only to the programs specifically enumerated in section 3406(b) of the CVPIA, beginning with anadromous fish doubling measures. *SL&DM Water Auth. I*, 637 F. Supp. 2d at 799-800. Recognizing the potential for overlaps between actions taken pursuant to a section (b)(2) primary purpose program and those under the 1995 WQCP and/or the ESA, the district court concluded that CVP yield used to meet WQCP and/or ESA requirements had to be counted against the 800,000 AF limits only when they "predominantly" contributed as well to one of the specified (b)(2) primary purpose measures. *Id.* at 802. That interpretation by the district court is consistent with the statutory language and the prior decisions of this court.[28] The district court drew an appropriate

---

[28]In lieu of the rule articulated by the district court, the Water Agencies offer the following alternative:

distinction between actions taken under the WQCP and/or ESA generally (which, as the district court acknowledged, *could* contribute to "primary purpose" objectives) and actions under the WQCP and/or ESA that "predominantly contribute[ ] to one of the primary purpose programs.' "[29] *Id.*

---

> If CVP water dedicated and managed to comply with an action required by a water quality central plan or imposed under the ESA also serves the fish, wildlife, and habitat restoration purposes and measures authorized by CVPIA, then such CVP water must be credited toward the 800,000 acre-feet (b)(2) limit; however, if CVP water dedicated and managed to comply with an action required by a water quality control plan or imposed under the ESA does not serve such a fish, wildlife, or habitat restoration purpose, then Interior has discretion not to credit towards the 800,000 acre-feet (b)(2) limit the use of such CVP water.

*See* Appellants' Opening Brief at 36. There are at least three problems with the Water Agencies' proposed rule. First, it is not reasonable to construe the CVPIA as requiring that *all* uses of CVP water that are generally intended to benefit fish and wildlife must be deemed to be (b)(2) primary purpose actions. Certainly with respect to "water quality control plan" requirements, such a construction would have the practical effect of nullifying Interior's discretion to effectuate the CVPIA's hierarchy of purposes. Second, although the 1995 WQCP sets forth beneficial uses for water including municipal and industrial, agricultural, and fish and wildlife uses, Appellants have not offered any examples of releases of water under the 1995 WQCP — and none come to mind — that would not provide at least some minimal benefit for fish or wildlife or habitat. It would be absurd to suggest that Congress intended that any and all releases of CVP water to improve water quality for municipal, industrial, agricultural purposes *must* be charged against the (b)(2) account whenever it has an incidental effect of benefitting some species of fish or wildlife. Third, Appellants' current position is essentially the same as the one which we previously rejected in *Bay Institute*, 87 Fed. Appx. at 639-40.

[29]The dissent disagrees with our approval of the "predominantly contributes" standard, believing that the criterion "sets too high a bar and leaves too much discretion in the hands of Interior in how to charge the other water that does not meet this high bar." It indicates that "[t]he part of this test that I find troubling is that water allocation must count as section (b)(2) water only if it '*predominantly* contributes to one of the primary purpose programs.' Otherwise, Interior could choose to count it, or not count it, at its whim."

**[9]** Second, the Water Agencies' contention that "the 'primary purpose' actions under section 3406(b)(2) include all

---

The dissent misconceives the context of the standard's application. The CVPIA provides that Interior is to ensure that "to the greatest degree practicable, the specific quantities of yield dedicated to and managed for fish and wildlife purposes under this title are credited against any additional obligations of the Central Valley Project . . . ." *See* section 3406(b)(1)(C), 106 Stat. at 4715. Thus, normally, Interior can and will credit against the (b)(2) account CVP yield expended for beneficial fish, wildlife or habitat restoration purposes pursuant to the 1995 WQCP or the ESA. However, where the situation arises that there is an insufficient remaining amount of dedicated (b)(2) yield or other conflict between water usage for WQCP/ESA purposes and for specified (b)(2) primary purpose programs, "Interior retains discretion not to count other secondary actions, *so long as doing so is necessary to give effect to the hierarchy of purposes.*" *SL&DM Water Auth. I*, 637 F. Supp. 2d at 802 (emphasis added). Thus, the dissent's fear that Interior could choose to count, or not count, water used for a (b)(2) primary purpose program "at its whim" is unfounded.

We recognize that the "predominantly contributes" standard allows Interior a greater degree of discretion than the dissent's alternative criterion of "effectuat[ing] the primary purpose in a consequential and non-incidental manner." However, there is nothing in the language of the CVPIA to suggest that Congress desired Interior's discretion on this matter to be more limited. To the contrary, the CVPIA specifically leaves it to the Secretary of the Interior to "dedicate and manage" the 800,000 AF of (b)(2) water (*see* section 3406(b)(2), 106 Stat. at 4715), and, if the Secretary finds that there is a portion of that yield which is not needed for purposes of section 3406, the Secretary is "authorized" (not ordered) to make such water available for other project purposes (*see* section 3406(b)(2)(D), 106 Stat. at 4716).

Moreover, in light of the fact that water releases often serve multiple purposes (especially regarding salinity control), it is unclear how exactly the dissent's "consequential and non-incidental" criterion would be applied consistent with our prior decision in *Bay Institute* and in such a way that it removes the excess (or "too much") discretion from the agency while leaving just the right amount of discretion behind. We have already held that it would be error to conclude "that Interior lacks discretion to refrain from crediting the amount of Project yield actually used for any (b)(2) purpose against the 800,000 acre feet of Project yield." *Bay Institute*, 87 Fed. Appx. at 639.

actions serving the purposes and measures authorized by the CVPIA" is both vague and inconsistent with the statute and our prior ruling. Section 3406(b)(2) states that the Secretary of the Interior is to "dedicate and manage annually eight hundred thousand acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title . . . ." The Water Agencies' position omits the statutory language that primary purpose actions (to which the 800,000 AF are to be dedicated) are limited to those which "implement[ ] the fish, wildlife, and habitat restoration purposes and measures" in the CVPIA. Thus, the Appellants' effort to untether the concept of the (b)(2) "primary purpose" from fish, wildlife, and habitat restoration measures actually delineated in the CVPIA is incorrect. Further, section 3406(b)(2) provides that after implementing the primary purpose, the remainder of the 800,000 AF can also be used "to assist the state of California in its efforts to protect the waters of the San Francisco Bay/Sacramento-San Joaquin Delta Estuary; and to help to meet such obligations as may be legally imposed upon the Central Valley Project under State or Federal law . . . including but not limited to additional obligations under the federal Endangered Species Act." The distinction in the statute itself between the primary restorative purpose (on the one hand) and those of water protection and meeting other legal obligations such as the ESA (on the other) clearly demonstrates that an action taken to meet water quality criteria and/or ESA requirements does not, by itself, fall within the category of a (b)(2) primary purpose. This is precisely the point we previously made in *Bay Institute*, 87 Fed. Appx. at 639-40.

**[10]** Third, we also again reject the Water Agencies' argument that "allowing Interior discretion to exclude water dedicated to WQCP or other uses from the (b)(2) account would eviscerate the 800,000 acre-feet limit and conflict with other CVPIA provisions." We have already held that "[i]f Interior were required to deduct some or all the water it uses for water quality and Endangered Species Act purposes from the (b)(2)

dedication, the water needed for implementation of the Improvement Act's restoration mandate could be relegated to a secondary role, or perhaps no role at all." *Id.* at 640. Appellants cite to language in section 3406(b)(1)(C) of the CVPIA which requires that:

> The Secretary shall cooperate with the State of California to ensure that, to the greatest degree practicable, the specific quantities of yield dedicated to and managed for fish and wildlife purposes under this title are credited against any additional obligations of the Central Valley Project which may be imposed by the State of California following enactment of this title, including but not limited to increased flow and reduced export obligations which may be imposed by the California State Water Resources Control Board in implementing San Francisco Bay/Sacramento-San Joaquin Delta Estuary standards pursuant to the review ordered by the California Court of Appeals in *United States v. State Water Resources Control Board*, 182 Cal.App.3d 82 (1986), and that, to the greatest degree practicable, the programs and plans required by this title are developed and implemented in a way that avoids inconsistent or duplicative obligations from being imposed upon Central Valley Project water and power contractors.

106 Stat. at 4715. Clearly, section 3406(b)(1)(C) does recognize that portions of the 800,000 AF utilized for (b)(2) purposes (including increased flows and reduced exports) could overlap with post-1992 water quality control measures imposed by California (such as the later-enacted 1995 WQCP). However, that provision does not particularly support the Water Agencies' case here. In the face of such overlap, the statute does not require any automatic or compulsory "one-for-one" deduction from the 800,000 AF (b)(2) account. Rather, the Secretary of the Interior is to "cooperate" with the

State of California "to ensure that, *to the greatest degree practicable*," the specific quantities of CVP yield used for fish and wildlife purposes designated in the CVPIA are "credited" against the additional obligations; and that, "*to the greatest degree practicable*," programs that are developed and implemented avoid imposing "inconsistent or duplicative obligations" on CVP contractors. The "to the greatest degree practicable" language indicates that any crediting against the dedicated 800,000 AF of CVP yield stemming from the overlap between actions taken for the primary (b)(2) purpose and actions required by post-1992 water quality and ESA measures would be left to Interior's expertise and discretion. *Cf. Central Delta II*, 452 F.3d at 1027 ("It is equally clear that the Bureau's is an extremely difficult task: to operate the country's largest federal water management project in a manner so as to meet the Bureau's many obligations. Recognizing this difficulty, Congress granted the Bureau considerable discretion in determining how to meet those obligations.").

Fourth, Appellants' argument (that "until it was faced with the 2004 accounting problem, Interior understood that it was required to count the 'non-B2 fishery actions' taken from June 17, 2004, through June 30, 2004, against the 800,000 acre-feet limit of section 3406(b)(2)") actually raises two issues: (1) whether the Bureau's prior guidelines and circulated notices mandated that the latter June 2004 releases be classified as primary purpose (b)(2) actions; and (2) whether, even if those guidelines and/or notices were not controlling, the record below fails to show any rational connection between the facts before the Bureau and its decision not to treat the latter June 2004 releases as predominantly undertaken for a (b)(2) primary purpose.

Initially, the Appellants rely on the 2003 Guidance Memo. They specifically point to the language therein which states:

> [A]ctions taken pursuant to the 1995 Water Quality Control Plan and State Water Resources Control

Board Decision D-1641 ("the 1995 WQCP") involve the dedication and management of Central Valley Project yield for long-term fishery beneficial use and protection. Such actions are not taken to help meet agricultural or municipal and industrial water quality standards that are set forth in the 1995 WQCP. Most of the fishery beneficial uses and objectives under the 1995 WQCP and in Reclamation's water rights permits help fulfill the fish, wildlife, and habitat restoration purposes and measures authorized by Section 3406(b). Consistent with the June 3, 2003 Ninth Circuit decision, much of the (b)(2) water that is dedicated and managed annually to help meet fishery beneficial use and protection objectives of the 1995 WQCP serves Section 3406(b)(2)'s "primary purpose" of fish, wildlife, and habitat restoration.

The 2003 Guidance Memo's characterization of the 1995 WQCP and its interpretation of the "primary purpose" language in the CVPIA are not controlling on this court. *See Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) ("[I]nterpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law — do not warrant *Chevron*-style deference. *See, e.g., Reno v. Koray*, 515 U.S. 50, 61 (1995) (internal agency guideline, which is not 'subject to the rigors of the Administrative Procedure Act, including public notice and comment,' entitled only to 'some deference' (internal quotation marks omitted)) . . . . Instead, interpretations contained in formats such as opinion letters are 'entitled to respect' under our decision in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), but only to the extent that those interpretations have the 'power to persuade,' *ibid*."); *accord League of Wilderness Defenders/Blue Mts. Biodiversity Project v. Forsgren*, 309 F.3d 1181, 1189 (9th Cir. 2002).

The 2003 Guidance Memo errs when its asserts that "actions taken pursuant to the 1995 Water Quality Control Plan

and State Water Resources Control Board Decision D-1641 . . . . are not taken to help meet agricultural or municipal and industrial water quality standards that are set forth in the 1995 WQCP." For example, the prevention of excessive salinity intrusion is a water quality objective for all three categories of "municipal and industrial," "agricultural," and "fish and wildlife" beneficial uses. *See* 1995 WQCP at 14. The 1995 WQCP specifically recognized that "[t]he water supply-related objectives include those for Delta outflow, river flows, export limits, the Delta Cross Channel gates, and salinity control for the protection of municipal and industrial supply, agricultural supply (excluding salinity objectives for protection of southern Delta agriculture . . .), and fish and wildlife. *Id.* at 27. It further noted regarding Southern Delta *agricultural* salinity that:

> Elevated salinity in the southern Delta is caused by low flows, salts imported in irrigation water by the State and federal water projects, and discharges of land-derived salts, primarily from agricultural drainage. Implementation of the objectives will be accomplished through the release of adequate flows to the San Joaquin River and control of saline agricultural drainage to the San Joaquin River and its tributaries . . . .

> This plan's objectives for flows in the San Joaquin River at Vernalis are expected to contribute to achieving the salinity objectives in the southern Delta. Presently, the [Bureau] is responsible for meeting Vernalis salinity objectives through the release of water from the New Melones Reservoir, as required under Water Right Decision 1422. Additional releases from other reservoirs for fish and wildlife protection in the San Joaquin River tributaries may be required through ongoing [Federal Energy Regulatory Commission] proceedings.

*Id.* at 29. Likewise, the water quality objectives incorporated in Table 3 of the 1995 WQCP for the reasonable protection of fish and wildlife also provide protection for some non-restorative beneficial uses such as navigation (*i.e.*, "uses of water for shipping, travel, or other transportation by private, military or commercial vessels") and commercial and sport fishing. *Id.* at 12, 15.

Further, as we have explained, the fact that certain water releases were not taken to help meet agricultural or municipal and industrial standards under the 1995 WQCP does not mean that they must necessarily be treated as (b)(2) primary purpose actions. Though it was not entirely evident at the time the 2003 Guidance Memo was issued, it became clear in the course of the 2004 (b)(2) accounting year from our revised decision in *Bay Institute* that the (b)(2) "primary purpose" is narrower than the 2003 Guidance Memo suggests. It consists not of fish, wildlife, and habitat restoration generally, but rather, only of those restoration measures which are specifically enumerated in section 3406(b)(2) of the CVPIA. *See* 87 Fed. Appx. at 639 ("Section 3406(b)(2) provides that the 'primary purpose' to which the 800,000 acre feet should be dedicated is the implementation of 'fish, wildlife, and habitat restoration purposes authorized by this title.' ").

Also, the USFWS recognized that the 2003 Guidance Memo was inconsistent with our view of the amount of discretion Interior enjoys under the CVPIA regarding the allocation of (b)(2) water. A USFWS document labeled "CVPIA § 3406(b)(2) Background," dated April 21, 2004, and bearing the notation "For DOI (b)(2) Discussion Purposes Only," included the following observation:

> April 2004 [the Bureau] and USFWS met to resolve inconsistencies between January 2004 Appellate Court ruling and Interior's December 2003 Guidance Memo. Inconsistencies identified by Service staff and DOI Solicitor's staff include:

. . . .

3. The Guidance Memo does not give effect to hierarchy of purposes as mandated by the Ninth Circuit Court and established in CVPIA.

**[11]** Finally, as the 2003 Guidance Memo indicates, "most of" (*but not all of*) "the fishery beneficial uses and objectives under the 1995 WQCP" also "help fulfill the fish, wildlife, and habitat restoration purposes and measures authorized by Section 3406(b)." It also states that "much of" (*but not all of*) "the (b)(2) water that is . . . [used] to help meet fishery beneficial uses and protection objectives of the 1995 WQCP serves section 3406(b)(2)'s 'primary purposes'. . . ." Thus, even under the 2003 Guidance Memo, there can be releases made for fishery beneficial objectives under the 1995 WQCP which will not serve section 3406(b)(2)'s primary purpose or be authorized by section 3406(b). Hence, the 2003 Guidance Memo, by itself, does not necessarily require any particular accounting treatment of the latter June 2004 releases.

The Appellants also refer to a November 22, 2004 joint letter ("2004 Joint Letter") from the Bureau's Regional Director and the Manager of the California- Nevada Office of the USFWS to the California Departments of Water Resources and Fish and Game. In particular, they cite to the following language in the 2004 Joint Letter:

There exists some confusion concerning whether 1995 WQCP actions must be credited against Interior's (b)(2) obligation. Some interested groups have observed that Interior has the discretion to count, or not to count, CVP water used for water quality control actions against the 800,000 acre-feet. The 1995 WQCP prescribes numerous actions that were developed in 1994 by Interior, working in consultation with the state, to help restore Delta fisheries, including anadromous fish. In fact, these fishery actions

were included in the 1995 WQCP at the request of Interior and other signatories to the Bay-Delta Accord. Counting CVP water used for the 1995 WQCP fishery actions, which further the CVPIA's primary restoration purposes, toward Interior's (b)(2) obligation is consistent with the priority of uses prescribed by the Act.

However, that language fails to support Appellants' arguments. The 2004 Joint Letter does not reach any conclusion whether any or all 1995 WQCP actions must be credited against the 800,000 AF (b)(2) account.[30] There is an ambiguity in the last sentence of the quote. It arises from whether the qualifying clause "which further the CVPIA's primary restoration purposes" is meant to: (1) denote that all "CVP water used for 1995 WQCP fishery actions" furthers the CVPIA's primary restoration purposes, or (2) denote that "counting CVP water used for 1995 WQCP fishery actions" (when the water used actually furthers the CVPIA's primary restoration purposes) against Interior's (b)(2) obligation is consistent with the priority of uses. The latter reading is the correct one. As noted in its 2003 Guidance Memo, Interior had already indicated that not all CVP water used for 1995 WQCP actions serves section 3406(b)(2)'s primary purpose.

Turning to the issue of whether the evidence and record below establishes a rational connection between the facts found and the agency's action, we initially note that the circumstances surrounding the latter June releases are largely

---

[30]The 2004 Joint Letter also indicates that "Interior implements its obligations under (b)(2) as described in the [May 2003 Decision]. Under that decision, . . . CVP water used for fish restoration actions, post-1992 Endangered Species Act actions, and 1995 Water Quality Control Plan . . . actions are fully credited against Interior's (b)(2) obligation." However, as noted above, fully crediting on an automatic basis all 1995 WQCP and post-1992 ESA actions against the 800,000 AF (b)(2) account would be in error and inconsistent with our decision in *Bay Institute*, 87 Fed. Appx. at 639-40.

undisputed. The WQCP objective of maintaining the appropriate salinity level at the X2 location near Port Chicago in the Delta reacts quickly to unregulated high storm runoff. If that objective is triggered, the Bureau may be obligated to significantly increase releases from CVP reservoirs and reduce water exports. In April 2004, due to high storm activity, the Bureau modified CVP operations to meet the X2 salinity objective by greatly augmenting releases from CVP reservoirs and reducing pumping from the Delta.[31] The Bureau accounted for those WQCP actions as (b)(2) fishery costs.

In April 2004, the Bureau realized that its current operations would cause the 800,000 AF limit on (b)(2) yield to be exceeded in late May or early June. Thus, at that time, the Bureau took steps to reduce (b)(2) actions and used available EWA assets to the extent possible. May 2004 was another month of heavy use of (b)(2) yield due to a combination of upstream releases, VAMP implementation, and releases from the New Melones reservoir.

The Bureau's subsequent actions taken in response to the problem are disputed. Appellants asserted before the district court, and again on this appeal, that the Bureau took a "no action alternative" wherein it continued to implement WQCP objectives and other measures it had theretofore categorized as (b)(2) fishery actions (and counted against the (b)(2) dedicated yield). According to Appellants, the Bureau then merely "re-categorized and rationalized" the latter June 2004 releases as being "non-B2 fishery actions" for purposes of the year end

---

[31]As recognized in Appellants' Opening Brief at page 20:

[T]he water costs of meeting the 1995 WQCP requirements relating to location of X2 during April [2004] were higher than Interior had anticipated . . . . The (b)(2) account incurred charges up to 35,000 acre-feet in a single day, mostly for releases at CVP facilities Nimbus and Keswick.

accounting. The district court properly rejected that character-ization.[32]

Additionally, the record demonstrates that the agency's decisions did not amount to an abuse of its discretion. As indi-cated in the 2003 Guidance Memo, "if the projected and/or realized WQCP/ESA costs for the accounting year exceed the [initially targeted] 500,000 acre-feet of (b)(2) water, the [USFWS] and [the Bureau] will confer to determine the best course of action. That conference will address the most bene-ficial use of the remaining (b)(2) water for fish and wildlife management actions that year, whether they are for fish, wild-life and habitat restoration purposes or to help meet WQCP standards and ESA obligations." Here, the USFWS and the

---

[32]As noted in the district court's initial decision:

> Plaintiffs suggest that after Interior realized that it was going to overshoot the 800,000 AF limit, they [sic] considered a variety of scenarios, . . . . , but chose a "no action alternative." In support of this assertion, Plaintiffs reference a table describing various alternatives at AR 1216. In that table, the "no action" alternative is described as an approach that would "[i]mplement WQCP and other primary purpose actions, let accounting go as accumulated, now projected at 978 TAF." *Id.* . . . It describes the benefits of this approach as being "[e]asy to implement" and "implements all primary purpose actions." *Id.* The risks are described as: "B2 costs estimated at 978 TAF, most likely to be challenged by stakeholders." *Id.* Other alternatives are listed on this chart, but the record does not reveal which of these, if any, Interior eventu-ally selected for implementation. Plaintiffs suggest that, despite not expressly choosing an alternative, Interior actually chose the "no action alternative." This makes some sense, given that, of the listed options, the no action alternative's estimate of 978 TAF of (b)(2) costs is closest to the actual amount expended on (b)(2) and "Non-B2 Fishery Actions." However, both Mr. Fujitani and Mr. Guinee take issue with the assertion that Interior decided to do nothing in response to the situation. Both state that Interior took steps to minimize (b)(2) actions in the face of mounting water costs. (First Guinee Decl. at ¶ 10; First Fujitani Decl. at ¶ 15.) Plaintiffs provide no evidence to the contrary.

*SL&DM Water Auth. I*, 637 F. Supp. 2d at 785 n.5.

Bureau did meet and estimated that approximately 775,000 AF of (b)(2) water had been used by the end of May 2004. They then prioritized the remaining 25,000 AF to particular primary purpose (b)(2) actions such as salmon restoration and doubling on Clear Creek.

Prior to the present dispute, the Federal Defendants had recognized that "only meeting the WQCP and post-1992 ESA requirements may not be sufficient to meet the anadromous fish doubling goal and other restoration purposes and measures included in the CVPIA." *See SL&DM Water Auth. I*, 637 F. Supp. 2d at 781 n.1. In May 2004, Interior was faced with the prospect that its then-present use of the dedicated (b)(2) yield for general WQCP and post-1992 ESA purposes would deplete the account by June 2004. Approximately 25,000 AF was left to satisfy specific (b)(2) purposes for the remaining four months of the 2004 accounting year. In such circumstances, Interior did not abuse its discretion in deciding not to charge the latter June 2004 releases (which were taken simply to meet the Delta outflow and Vernalis flow objectives) against the (b)(2) account, especially given our instruction that it was not required to deduct some or all of the water utilized for water quality and/or ESA purposes from the 800,000 AF yield when the water is needed for the implementation of specific CVPIA restoration mandates.

[12] The Appellants counter that the Delta outflow and Vernalis flow standards were placed in the 1995 WQCP specifically to protect fish and wildlife beneficial uses. However, as noted previously: (1) not every measure taken to protect some species of fish or wildlife automatically becomes a primary purpose under (b)(2); (2) Interior is not required to deduct some or all of the water it uses for water quality or ESA purposes from the (b)(2) 800,000 AF account; and (3) Interior has discretion to refrain from crediting Project yield actually used for some (b)(2) purpose when doing so will help effectuate the hierarchy of purposes established in Section 3406(b)(2). Here, the evidence did not demonstrate that the

latter June 2004 releases were actually made to implement any specifically designated primary purpose measure (*i.e.* one that fell within CVPIA § 3406(b)(1), (4), (5), (8), (9), (12), (18) or (19)).[33] That was especially the case where: (1) the USFWS stated that it did not recommend that the latter June releases be made to effectuate primary fish restoration purposes, and (2) there apparently were no appreciable amount of juvenile salmon in the impacted waterways which could have benefitted from such increased releases.[34] Thus, where

---

[33]The fact that the latter June 2004 releases were not made for a specific (b)(2) primary purpose was established in an exchange at the August 18, 2008 hearing before the district court. When asked by the court to identify the specific justifications for those water actions, Charles R. Shockey (counsel for the Federal Defendants) stated that:

> [T]he Nimbus releases into the American River [were made] . . . . to meet the Delta outflow requirements under the water control — Water Quality Control Plan . . . . [I]t was not action taken for any specific fishery restoration purpose[.] . . .

> [The other] release was made to assist in meeting the Vernalis flow requirements, again, under the Water Quality Control Plan, to ensure that there would be sufficient flow through that stretch of the San Joaquin River. And this was to meet, again, the Water Quality Control Plan requirements. . .

> The purpose of this release was not to assist out migrating fish, which apparently had already moved through the system by then. Rather, it was to assist in meeting the salinity requirements in the Delta. . . .

> Well, earlier in the season, there had been a significant problem with the X2 point . . . . [T]he basic purpose, is to keep the salinity — the X2 point further downstream in the Delta.

When asked by the district court if either the Water Agencies or the Environmental Parties had "any different interpretation or view of the purposes of those uses," Daniel J. O'Hanlon (counsel for the Water Agencies) responded: "I think Mr. Shockey accurately described the quantity and location of the releases and that they were intended to meet water quality standards." O'Hanlon also added that those standards were "designed to protect fish and wildlife beneficial uses."

[34]As explained in the initial Guinee Declaration at paragraphs 12 and 13:

the 800,000 AF limit was nearly exceeded with four months remaining in the accounting year and the Bureau and USFWS had agreed that specific anadromous fish doubling measures still needed to be accomplished (such as salmon restoration and doubling on Clear Creek), Interior's exercise of its discretion to treat the latter June 2004 releases as "non-(b)(2) fishery actions" was proper and entirely consistent with our prior ruling in *Bay Institute.*

Appellants further cite to language from one of Interior's summaries that purportedly describe the latter June 2004 releases as falling within the anadromous fish doubling purpose:

> June 2004 — UA — Interior maintained instream flow conditions with releases from CVP reservoirs to provide suitable habitat for system migration, egg incubation, rearing and automigration for anadromous fish, including listed runs of Chinook salmon and steelhead trout, and improve conditions for estuarine species by helping to meet WQCP objectives[.]

But, as correctly pointed out by Appellees, that language only refers to the initial June 2004 actions. The summary goes on to describe the latter June 2004 releases as follows:

> — American River flows (Nimbus releases) ranged from approximately 1,800-2,300 cfs consistent with the base case flows. In the latter part of the month

---

The [USFWS] did not recommend this flow increase [*i.e.* the latter June 2004 increased Nimbus and New Melones releases] to meet the primary fish, wildlife and habitat restoration purposes of CVPIA . . . . Said another way, were it not for the WQCP, the Service would not have recommended that [the Bureau] increase flow releases [on June 17, 2004 in the American River or on June 26, 2004 above the baseline flows on the Stanislaus River] for primary fish restoration purposes pursuant to CVPIA . . . .

releases were increased to approximately 2,500 cfs to meet Delta demands.

— Stanislaus River flows . . . were augmented with (b)(2) assets to increase flows in the latter half of June to approximately 1,200 cfs compared to the base case flows of 450 cfs in order to help meet WQCP Vernalis flow requirements.

**[13]** Finally, even though there is no substantial basis for concluding that Interior's accounting treatment of the latter June 2004 releases was simply an after-the-fact rationalization, we note that the district court was forced to rely to a large extent on after-the-fact declaration testimony and other evidence to explain that treatment. As the district court observed:

Although normally judicial review is confined to the administrative record, there may be circumstances to justify expanding the record or permitting discovery. The broadest exception . . . is the one which permits expansion of the record when necessary to explain agency action. When there is "such a failure to explain administrative action as to frustrate judicial review," a court may receive from the agency, either through affidavits or testimony, "such additional explanations of the reasons for the agency decision as may prove necessary." *Public Power Council v. Johnson*, 674 F.2d 791, 793-94 (9th Cir. 1982) (quoting *Camp v. Pitts*, 411 U.S. 138, 143 [(1973)] (per curiam)).

*SL&DM Water Auth. I*, 637 F. Supp. 2d at 806 n.19. Appellants do not challenge the district court's decision to supplement the administrative record, nor do they challenge any of the declarations relied upon by the district court.[35] Based on

---

[35]Appellants do, however, correctly assert that Appellees' briefs improperly rely in part on declaration testimony that was stricken from evidence by the district court. Our conclusion that Interior did not abuse its discretion does not depend upon any of the stricken testimony.

that evidence (*e.g.* Dr. Swanson's testimony that the releases could not have benefitted salmon because in late June 2004 most of the juvenile salmon were gone from the San Joaquin River), the district court properly concluded that the disputed Nimbus and New Melones releases did not predominantly have the effect of benefitting anadromous fish populations.[36]

[14] Much work, and, possibly, this entire appeal, could have been avoided had Interior either (1) implemented a more coherent set of accounting procedures after it became aware of our January 2004 amended decision, or (2) given a complete explanation of its accounting for the 2004 Water Year at some time prior to its being challenged in court. Because we find that the explanations Interior has offered are not mere post hoc rationalizations,[37] however, its failure to give full

[36]With regard to the Vernalis flow requirements, it is noted that Attachment B to the Bay-Delta Accord — along with requiring the Bureau to maintain water quality conditions sufficient to achieve the narrative fish doubling goal — refers to the provision of flows "in accordance with the biological opinion for Delta Smelt," a non-anadromous fish. Thus, it is clear that Interior reasonably concluded that the June 2004 releases were made to benefit a variety of species of fish and other wildlife, as well as for certain other non-(b)(2) purposes, and did not have to be charged against the (b)(2) account in the situation presented at that time.

[37]The dissent argues that Interior's "re-categorization of the late June 2004 releases from the Nimbus and New Melones reservoirs was a purely post-hoc rationalization by Interior" because "Interior realized too late that it was using too much water that it believed had to be charged as section (b)(2) water, and back-peddled in order to make its year end numbers match." That characterization mis-perceives the undisputed facts and the manner in which the agency's operations are carried out. Interior does not set an inflexible schedule of water releases at the beginning of the accounting year, such that one can argue that the agency realized too late that it was using too much CVP yield that had to be charged as (b)(2) water. Rather, the agency begins with certain forecasts and then updates the actual hydrology and CVP operations data each month, which it then utilizes to determine the appropriate future steps to be taken. Moreover, the water quality control plan objectives contained in the 1995 WQCP and the D-1641 (such as salinity levels) are sensitive to actual hydrological conditions that cannot be fully anticipated or forecasted.

contemporaneous explanations does not amount to an abuse of discretion or otherwise invalidate its actions.

## CONCLUSION

**[15]** The district court properly found that the Appellants had standing to challenge Interior's decisions regarding its treatment of the latter June 2004 releases and that Interior's accounting with respect to those releases was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The judgment of the district court is therefore **AFFIRMED**.

---

M. SMITH, Circuit Judge, concurring in part and dissenting in part:

While I join in the majority's conclusion on standing as outlined in Part A of the Analysis section, I respectfully, but strongly, dissent from the other parts of the majority opinion.

---

In March and April of 2004, storms and high runoffs required unanticipated increases in the use of (b)(2) water to meet the X2 water quality objectives. Thereafter, Interior's decision (not to count the 9,000 AF released from the Nimbus and New Melones reservoirs in late June 2004 to meet the WQCP Delta outflow and Vernalis flow requirements when there were negligible salmon in their associated rivers, but instead to save and dedicate that CVP yield for particular primary (b)(2) purposes such as salmon restoration and doubling in Clear Creek) was not a post hoc rationalization. Rather it was an exercise of the precise discretion which we recognized the agency had under the CVPIA "to refrain from crediting the amount of Project yield actually used for any (b)(2) purposes against the designated 800,000 acre feet . . . ." *Bay Institute*, 87 Fed. Appx. at 639. Indeed, the dissent virtually concedes this point in its observation that "if the water release were to occur at the end of the salmon run, and the salinity adjustment was not crucial to survival of the few salmon still there, but would still have marginally beneficial effect, Interior should have discretion to not count this release as section (b)(2) water."

The truth is that the Department of the Interior's (Interior) re-categorization of the late June 2004 releases from the Nimbus and New Melones reservoirs was a purely post-hoc rationalization by Interior, when it realized that it would run out of section 3406(b)(2) water to use for the year. Such a post-hoc rationalization flies in the face of what the Central Valley Project Improvement Act (CVPIA or Act), Pub. L. No. 102-575, 106 Stat. 4600 (1992), mandates, as well as the requirements of controlling case law. Moreover, affirming the district court's "predominantly contributes to a primary purpose" standard, as the majority does, will inevitably lead to an evisceration of the politically delicate, negotiated limits on certain water uses clearly envisioned by the Congress when it enacted the CVPIA. I would reverse and remand to the district court.

"A man from the West will fight over three things: water, women and gold, usually in that order." This quote from the late Senator Barry Goldwater illustrates a conflict that has been present in California since its early days. In California, water is life, and its absence is death, at least economically. Central Valley Project (CVP) water in particular is a precious resource for many competing interests. No one denies that protecting the fish, wildlife, and environment of the Central Valley, including Chinook salmon, Delta smelt, and other anadromous fish, is extremely important, and Congress has so found. But those are not the only interests at stake, which is what set up the Congressional fight that led to the limits included in the CVPIA. On the other side of the political divide stands another interest of enormous importance—protecting the livelihood of the farmers and workers who have harvested crops in the Central Valley for decades, and the legions of communities that depend on them.

The state of California produces more than half of the fruits, nuts, and vegetables grown in the United States, including many crops that are exclusively grown in California.[1] The

---

[1] California Department of Food and Agriculture, California Agricultural Resources Directory 2010–11 at 17, http://www.cdfa.ca.gov/Statistics/PDFs/ResourceDirectory_2010-2011.pdf.

San Joaquin Valley, known as "America's fruit basket," is home to a 20 billion dollar crop industry and produces more in farm sales than any other individual state in the country.[2] Nine of the ten top agricultural production counties in the United States are in California.[3] Six of those counties, including Fresno, Tulare, Kern, Merced, Stanislaus, and San Joaquin counties, depend on CVP water for their crops.[4]

The de facto motto of this agriculture-dependant region of the nation is "No water, no work." The economic devastation to the Central Valley that has resulted from the type of water conflict represented by this lawsuit is pervasive. One need only take a drive down Highway 99, or Interstate 5, from Sacramento down to Bakersfield to witness the profound effect that a lack of water has had on this region. Approximately 250,000 acres of once-productive farmland lies fallow and unproductive.[5] The unemployment rates in the affected communities range from 20 percent up to 40 percent. *Id.* Mendota, one hard hit town, had a 38% unemployment rate in 2009, and nearly all of those who lost their jobs were farm workers.[6]

The reality is that water used to satisfy one interest necessarily takes water away from other interests. Thus, as has always been true in California, allocation of water requires a delicate balance, with potentially devastating implications. For that reason, the Congressional negotiations that ultimately

---

[2]Katie Paul, *Dying on the Vine*, Newsweek, Aug. 23, 2009, at 1, *available at* http://www.newsweek.com/2009/08/23/dying-on-the-vine.html.

[3]California Agricultural Resources Directory at 18-19.

[4]*See* Bureau of Reclamation, Map of Central Valley Project, http://www.usbr.gov/projects//ImageServer?imgName=Doc_123810 4613478.pdf.

[5]Valerie Richardson*, It's the Farmers vs. Fish for California Water*, The Washington Times, Aug. 20, 2009, *available at* http://www.washingtontimes.com/news/2009/aug/20/its-farmers-vs-fish-for-california-water/.

[6]*Dying on the Vine* at 1.

led to the passage of the CVPIA were lengthy, bitter, and highly charged. However, when the negotiations concluded, the parties had reached a compromise regarding the allocation of certain water supplies. In my view, the guts of that hard won political compromise are about to be rendered meaningless by well-intentioned colleagues, who neither represent an affected constituency, nor have the technical expertise nor institutional capacity, to weigh the almost-certain impact of their ruling on those whose lives and fortunes will be devastated by them. For that reason, I believe we should faithfully adhere to the specifics of the political compromise contained in the Act, and not undermine that compromise through legal sophistry.

## A.   The History of the CVPIA

The CVPIA was passed as part of the Reclamation Projects Authorization and Adjustment Act of 1992. Pub L. 102-575, 106 Stat. 4600. On June 20, 1991, the House passed the original bill that would become the Act, H.R. 429. 137 Cong. Rec. D797-01. This early version of the Act did not contain any title pertaining to wildlife, fish, and habitat rehabilitation in the Central Valley, including the 800,000 acre foot (AF) limitation. *See generally* 137 Cong. Rec. H4799-01.

On April 10, 1992, the Senate, after its subcommittee meetings in October of 1991, passed an amended bill, which included among other provisions "Title XXXIV—CENTRAL VALLEY PROJECT FISH AND WILDLIFE ACT." 138 Cong. Rec. S5564-02. While this new addition set forth many of the same goals as the eventual CVPIA does—namely, to "protect, restore, and enhance fish and wildlife habitat in the Central Valley of California"—then-section 3406 still did not contain the explicit 800,000 AF requirement. *Id.* at S5596-5601. Rather, this section called for the establishment of a Central Valley Project Fish and Wildlife Advisory Committee and Task Force to carry out the purposes of the title. *Id.* at S5599-5600.

On June 18, 1992, the House considered and passed a sepa-
rate bill, H.R. 5099, entitled the Central Valley Project
Improvement Act. 138 Cong. Rec. H4918-06. This bill origi-
nally aimed to designate 1.5 million AF of water to be taken
off the top of CVP water for the purposes of fish and wildlife
enhancement and mitigation. *Id.* at H4921. However, the ver-
sion of the bill that was being considered at this time did not
specify an amount of water that must be allocated for such
purposes. *Id.* at H4921. Instead, this bill stated that the Secre-
tary of the Interior will:

> Develop and implement a program for the acquisi-
> tion of a water supply adequate to meet the purposes
> and requirements of this section. Such a program
> should identify how the Secretary will secure this
> water supply, utilizing the following options in order
> of priority: improvements in or modifications of the
> operations of the project; conservation; transfers;
> conjunctive use; purchase of water; purchase and
> idling of agricultural land; reductions in deliveries to
> Central Valley Project contractors.

*Id.* at H4926.

The bill was then incorporated into H.R. 429 on June 30,
1992. Title XXXIV of the bill became titled the Central Val-
ley Reform Act and Section 3406 was titled "Fish, Wildlife
and Habitat Reformation." 138 Cong. Rec. H5589-02, H5615.
Section 3406(b)(1) dealt with fish doubling and section
3406(b)(2) specified that the Secretary of the Interior will:

> upon enactment of this Act, and after implementing
> the operational changes authorized in subsection
> (b)(1)(B), *make available project water for the pri-
> mary purpose of implementing the fish, wildlife, and
> habitat restoration purposes and measures autho-
> rized by this section*, except that such water shall be
> in addition to that required to implement subsections

(b)(6) and (b)(15)(A). This water may be assigned immediately to supplement instream flows. The United States Fish and Wildlife Service shall conduct studies and monitoring activities as may be necessary to determine the effectiveness of such flows in meeting the goal established in subsection (b)(1). At the end of the initial five year period, the Secretary shall adjust the quantity of water assigned as necessary to meet the goal;

*Id.* at H5617-18 (emphasis added).

At that point, the House and Senate did not agree on the proposed amendments. Though the 800,000 AF figure was not part of either bill, the joint House-Senate conference compromise finally introduced the 800,000 AF provision. 138 Cong. Rec. H11493-01. The newly compromised bill mirrored the relevant language of the current Act:

> upon enactment of this title *dedicate and manage annually 800,000 acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title*; to assist the State of California in its efforts to protect the waters of the San Francisco Bay/Sacramento-San Joaquin Delta Estuary; and to help to meet such obligations as may be legally imposed upon the Central Valley Project under state or federal law following the date of enactment of this title, including but not limited to additional obligations under the federal Endangered Species Act.

138 Cong. Rec. H11572-01, H11605 (emphasis added). The hearings revealed that this figure had been negotiated down from the 1 million plus AF down to 800,000 AF. 138 Cong. Rec. S17289-01, S17303.

The legislative history noted was proceeded by years of discussion, and illustrates that the terms of the final Act passed in Congress—including the 800,000 AF limitation on water to be used for "fish, wildlife, and habitat restoration purposes" in section (b)(2)—were the carefully negotiated results of a long political process. To give effect to Congressional intent, and the plain meaning of the Act, we must tread very carefully, so as not to allow the 800,000 AF limitation to become meaningless. Unfortunately, the majority opinion will, in my view, lead to that very result.

## B.    The District Court Standard

Section 3406(b)(2) of the CVPIA states that the Secretary of the Interior shall:

> upon enactment of this title *dedicate and manage annually eight hundred thousand acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title*; to assist the State of California in its efforts to protect the waters of the San Francisco Bay/Sacramento-San Joaquin Delta Estuary; and to help to meet such obligations as may be legally imposed upon the Central Valley Project under State or Federal law following the date of enactment of this title, including but not limited to additional obligations under the Federal Endangered Species Act.

On its face, section (b)(2) allows 800,000 AF of CVP water to be used "for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title." Next, section (b)(2) allows the Interior to "assist" the State of California in its protection efforts of the Delta Estuary. Finally, section (b)(2) allows the Interior to "help" to meet any other obligations under Federal or State law, such as the Endangered Species Act.

In the first ruling by the district court in this litigation, on October 19, 2001, the court held that "Interior had 'discretion to annually determine how much CVP yield to devote to WQCP or post-CVPIA ESA requirements' but had no discretion 'whether or not to count CVP yield used for such (b)(2) purposes' (i.e., all such uses must be counted)." *San Luis & Delta-Mendota Water Auth. v. Interior*, 236 F.R.D. 491, 494 (E.D. Cal. 2006). The court explained:

> Section 3406(b)(2) unambiguously directs Interior to "dedicate and manage annually eight hundred thousand acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title." Interior has no discretion whether to annually provide more or less than 800 TAF of CVP yield [ ] for (b)(2) purposes, unless it makes certain findings under CVPIA § 3406(b)(2)(C) . . . . Interior is also directed to annually dedicate and manage the mandatory 800 TAF of CVP yield "to assist the State of California in its efforts to protect the waters of the San Francisco Bay/Sacramento-San Joaquin Delta Estuary [ i.e., the WQCP]; and to help to meet such obligations as may be legally imposed upon the [CVP] under State or Federal law following the date of enactment of this title, including but not limited to additional obligations under the Federal Endangered Species Act." *As a matter of law, this language is not ambiguous—water used to meet WQCP or post-CVPIA ESA requirements is an additional (b)(2) purpose and must be charged against the 800 TAF (b)(2) mandate if so used*.
>
> The CVPIA is not silent on what amount of water used for these so-called "secondary" purposes is to be credited against the 800 TAF (b)(2) mandate. (E.g., could all 800 TAF of (b)(2) water be used to meet post-CVPIA-enactment ESA requirements?).

Congress mandates that exactly 800 TAF of CVP yield [ ] be dedicated for (b)(2) purposes, whether "primary" or "secondary." To hold otherwise would render the 800 TAF figure superfluous. *This leaves to Interior, the discretion to annually determine how much CVP yield to devote to WQCP or post-CVPIA ESA requirements. However, if it were left to Interior's "discretion" whether or not to count CVP yield used for such (b)(2) purposes, the annual 800 TAF cap would be illusory.* The 800,000 TAF is intended by Congress as an immutable floor and ceiling on annual reallocation of water from CVP yield for (b)(2) purposes. If Interior uses more than 800 TAF for (b)(2) purposes in any year, but does not count all CVP yield used for such purposes, it violates CVPIA § 3406(b)(2).

*Id.* (internal citations omitted) (emphasis added). Thus, the district court ruled that Interior has discretion on how to allocate water within section (b)(2) purposes. For example, it could decide to use 500,000 AF for primary purposes, 200,000 AF to assist the State of California (via WQCP), and 100,000 AF for ESA. However, Interior does not have discretion to not charge, for example, the water used for WQCP as section (b)(2) water.

On appeal, we issued a non-precedential decision on June 3, 2003 and an amended decision on January 23, 2004, *Bay Inst. of San Francisco v. United States*, 66 F. App'x 734, 735 (9th Cir. 2003); *Bay Inst. of San Francisco v. United States*, 87 F. App'x 637 (9th Cir. 2004), reversing the district court on this holding:

*The district court erred in concluding that Interior lacks discretion to refrain from crediting the amount of Project yield actually used for any (b)(2) purpose against the designated 800,000 acre feet of Project yield.* To hold otherwise would defeat the primary

purpose for which the 800,000 acre feet were designated-fish, wildlife, and habitat restoration. Section 3406(b)(2) provides that the "primary purpose" to which the 800,000 acre feet should be dedicated is the implementation of "fish, wildlife, and habitat restoration purposes authorized by this title . . . ." Section 3406(b)(2) also provides that the 800,000 acre feet may be used to "help" meet obligations under the Endangered Species Act and to "assist" in meeting water quality standards. *If Interior were required to deduct some or all the water it uses for water quality and Endangered Species Act purposes from the (b)(2) dedication, the water needed for implementation of the Improvement Act's restoration mandate could be relegated to a secondary role, or perhaps no role at all.* Such a scenario would directly conflict with the Interior's mandate to give effect to the hierarchy of purposes established in Section 3406(b)(2).

*Bay Inst.*, 87 F. App'x at 637 (emphasis added). In my view, our previous merit panel attempted to deal with a situation such as the following: Assume, for example, a scenario where 1 million AF was needed for the water quality/outflow requirements under WQCP every year. Thus, if Interior *had* to charge this water against section (b)(2) water—regardless of whether that water furthers a primary purpose or not—then Interior would have none of the 800,000 AF allocation left for the "primary purposes," thus relegating the "primary purposes" related to anadromous fish to "no role at all." Under our non-precedential ruling, if a water allocation is made pursuant to the WQCP and serves the purpose of achieving a salinity level for agricultural purposes, but marginally, and as a side effect also helps salmon who might find the new salinity level more favorable, the water does not necessarily count as section (b)(2) water. We placed the focus on whether water used is "for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures autho-

rized" by section (b)(2), and rejected the concept that water used for other non-section (b)(2) purposes—such as for WQCP or ESA purposes—categorically must count as section (b)(2) water.

Our prior cases do not detract from the fact that the politically negotiated 800,000 AF number was meant to be a hard limit. In other words, Interior cannot go above it and it is not within the Interior's discretion to do so. However, the focus of the inquiry on when water allocated serves a primary purpose leaves open the question of *how* to determine if an allocation of water is "for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title."

In answering this question, the district court applied the following test:

> In practice, many actions taken to fulfill the fishery beneficial uses and objectives of the WQCP and/or actions taken to comply with the ESA may serve the primary purpose of the CVPIA. In keeping with the general structure of the CVPIA's language, if the "primary" purpose of any action taken under the WQCP and/or the ESA is to support or effectuate a "primary purpose" program, such action must be counted toward the (b)(2) account. Environmental Plaintiffs advance a helpful definition of the term "primary," the ordinary meaning of which is "predominant," of "first importance," or "principal." *See Malat v. Riddell*, 383 U.S. 569, 572 (1966). *Applying this definition, if an action taken under the WQCP and/or the ESA predominantly contributes to one of the primary purpose programs (e.g., fish doubling), it must be counted toward the 800,000 AF limit. Interior retains the discretion not to count other secondary actions, so long as doing so is necessary to give effect to the hierarchy of purposes.*

*San Luis & Delta-Mendota Water Auth. v. Interior*, 637 F. Supp. 2d 777, 802 (E.D. Cal. 2008) (emphasis added). The part of this test that I find troubling is that water allocation must count as section (b)(2) water only if it "*predominantly* contributes to one of the primary purpose programs." Otherwise, Interior could choose to count it, or not count it, at its whim. No test we approve should permit the 800,000 AF negotiated, hard limit to be rendered meaningless, but I fear that the district court's "predominantly contributes" test, which the majority blesses in its opinion, will eventually yield exactly such a result.

First, the district court's test seems to confuse the use of the word "primary" in the CVPIA. As we previously have recognized, section 3406(b)(2) presents a hierarchy of purposes. *Bay Inst.*, 87 F. App'x at 637.

> Section 3406(b)(2) provides that the "primary purpose" to which the 800,000 acre feet should be dedicated is the implementation of "fish, wildlife, and habitat restoration purposes authorized by this title . . . ." Section 3406(b)(2) also provides that the 800,000 acre feet may be used to "help" meet obligations under the Endangered Species Act and to "assist" in meeting water quality standards.

*Id.* Thus, "primary" as used in the statute most logically applies to the hierarchy of purposes. In other words, the primary purpose—of first and of first importance—is that the water should be used for fish, wildlife, and habitat restoration. Next, the water may be used to meet other obligations and water quality standards. The district court erroneously confuses this hierarchy of purposes with *when* an action is "for a primary purpose." Stating that the word "primary" also has an ordinary meaning of "predominant," the district court opines that an action therefore only serves a "primary purpose" if it "predominantly" serves it. *Bay Inst.*, 87 F. App'x at 637. However, there is nothing in the Act that indicates that

its single use of the word "primary" means that water alloca-tion has to "primarily" be for a "primary" purpose in order for it to count under section (b)(2). Thus, I do not find that the district court's test is mandated by, or consistent with, the plain language of the Act.

Second, the district court test that a water allocation must "predominantly contribute" to a primary purpose will likely work to eviscerate the 800,000 AF limit. Consider the follow-ing hypothetical: (1) Interior allocates 500,000 AF of water to achieve a beneficial salinity under WQCP, that furthers agri-cultural purposes and helps both anadromous and non-anadromous fish that live in the river where the release is made; (2) Interior allocates 500,000 AF of water under the ESA to help a variety of animals, including both anadromous and non-anadromous fish. There is clearly an overlap of pur-poses with each release, and these releases go toward both primary and non-primary section (b)(2) purposes. However, under the "predominantly contributes" test, Interior would be able to charge 0 AF of this water as section (b)(2) water, even though a primary purpose is served by the releases, because the water release contributes to several other non-section (b)(2) purposes as well and thus, does not "predominantly" serve a primary purpose. This would leave the Interior with its entire 800,000 AF section (b)(2) water allocation—on top of this 1 million AF already spent—to further aid the primary purposes. While the water allocation at issue in this case is 9000 AF, under the majority's standard, Interior could easily explain away a much larger allocation of water.

This scenario may lead some on one side of the issue to ask, "so what?" This is simply more water to help more anad-romous fish, which can only better the environmental outlook of the Central Valley. However, such a perspective obscures the fact that water used in this way will necessarily subtract from water that is allocated to the various cities and residents of those cities that depend on the same water for their liveli-hood and existence. In this sense, the size of the pie in a given

year is fixed. A bigger slice for one person means a smaller slice for another. Most importantly (as already noted), adopting the standard set by the district court, and blessed by the majority, will inevitably eviscerate the meaning of the 800,00 AF number, and change it from a hard limit to a wish list.

Certainly, Interior has *some* discretion on how to charge section (b)(2) water. I do not accept the Water Agencies' position that CVP water dedicated and managed to comply with an action required by the WQCP that also serves the fish, wildlife, and habitat restoration purposes *in any way* must be credited toward the 800,000 AF section (b)(2) limit. This rule draws too sharp a line, and like we found in *Bay Institute*, would be too limiting on the hierarchy of purposes in section (b)(2). Under the Act, Interior could consider how much benefit there is to section (b)(2) primary purposes compared to other benefits. For example, if a water release coincided with a high population of salmon in the river, along with a few other species of non-anadromous fish, and the salinity level was crucial to ensure the survival of the salmon, then such water must count. However, if the water release were to occur at the end of the salmon run, and the salinity adjustment was not crucial to survival of the few salmon still there, but would still have a marginally beneficial effect, Interior should have discretion to not count this release as section (b)(2) water. I would not go so far as to say that a water allocation must "predominantly contribute" to a primary purpose. This standard sets too high a bar, and leaves too much discretion in the hands of Interior in how to charge the other water that does not meet this high bar. In my view, it is sufficient if a water release serves or effectuates the primary purpose in a consequential and non-incidental manner.

## C.   The Late June 2004 Releases

Irrespective of the erroneous standard that the district court set and that the majority affirms, the majority additionally ignores the overwhelming evidence that shows that what Inte-

rior did in accounting for the June 2004 Nimbus release (to meet Delta outflow objectives) and New Melones release (to meet Vernalis flow objectives) was nothing short of post-hoc rationalization that we must find to be an abuse of discretion.

Interior itself released two telling documents on what its policies and practices were in how to charge water released pursuant to the 1995 WQCP. First, in a December 2003 Guidance Memo, Interior stated:

> [A]ctions taken pursuant to the 1995 Water Quality Control Plan and State Water Resources Control Board Decision D-1641 . . . involve the dedication and management of Central Valley Project yield for long-term fishery beneficial use and protection. *Such actions are not taken to help meet agricultural or municipal and industrial water quality standards that are set forth in the 1995 WQCP.* Most of the 1995 WQCP . . . help fulfill the fish, wildlife, and habitat restoration purposes and measures authorizes by Section 3406(b). Consistent with the June 3, 2003 Ninth Circuit decision, *much of the (b)(2) water that is dedicated and managed annually to help meet fishery beneficial use and protection objections of the 1995 WQCP serves Section 3406(b)(2)'s "primary purpose" of fish, wildlife, and habitat restoration.*

Furthermore, in a November 22, 2004 joint letter from the Regional Director and the Manager of California-Nevada Office of the Fish and Wildlife Service stated that:

> There exists some confusion concerning whether 1995 WQCP actions must be credited against Interior's (b)(2) obligation. Some interested groups have observed that Interior has the discretion to count, or not to count, CVP water used for water quality control actions against the 800,000 acre-feet. The 1995

WQCP prescribes numerous actions that were developed in 1994 by Interior, working in consultation with the state, to help restore Delta fisheries, including anadromous fish. In fact, these fishery actions were included in the 1995 WQCP at the request of the Interior and other signatories to the Bay-Delta Accord. *Counting CVP water used for the 1995 WQCP fishery actions, which further the CVPIA's primary restoration purposes, towards Interior's (b)(2) obligation is consistent with the priority of uses prescribed by the Act.*

In addition to these Interior documents, the WQCP itself sheds light on why some of its objectives were instituted in the first place. "The objectives for the protection of fish and wildlife beneficial uses are established for the following parameters: dissolved oxygen, *salinity* (expressed as electrical conductivity), *Delta outflow*, river flows, export limits, and Delta Cross Channel gate operation." WQCP at 14. The Delta outflow objectives have been included "for the protection of estuarine habitat for anadromous fishes and other estuarine-dependent species." *Id.* at 15. The purpose of the Vernalis flow requirement is "to provide attraction and transport flows and suitable habitat for various life stages of aquatic organisms, including Delta smelt and chinook salmon." *Id.*

These two documents, along with the 1995 WQCP objectives, unequivocally show the reasoning behind why Interior in April 2004 charged water designed to implement the VAMP, to meet Delta outflow objectives, and to meet Vernalis flow objectives to the section (b)(2) account. They show the reasoning behind why Interior also charged water to meet the WQCP requirement as to the location of X2 as section (b)(2) water. Similarly, in May 2004, they explain why Interior charged to the section (b)(2) account water that was used for upstream releases, VAMP implementation, and releases from the New Melones Reservoir. The charge of these water

allocations are wholly consistent to the Interior's own docu-ments and the WQCP objectives.

However, subsequent to these releases, the daily accounting showed that by June 1, 2004, with still four months remaining in the 2004 section (b)(2) accounting year, Interior had used up all but 25,000 AF of its section (b)(2) water. It was not until Interior realized that it was running out of section (b)(2) water allocation that it changed its mind about how to charge similarly allocated water in the late June 2004 releases. The Nimbus release, which aimed to maintain Delta outflow objectives, was not charged to the section (b)(2) account even though water that was released to meet this objective in April 2004 was so charged. Likewise, the New Melones release, which aimed to maintain the Vernalis flow release, was not charged to the section (b)(2) account even though water that was released to meet this objective in April and May of 2004 was so charged.

This situation does not present a case where Interior care-fully considered and exercised its discretion in a meaningful way to categorize water releases that it truly believed did not further a primary purpose under section 3406(b)(2). Such is the discretion that is afforded to Interior under section (b)(2) and in *Bay Institute*. Rather, this situation is one where Inte-rior realized too late that it was using too much water that it believed had to be charged as section (b)(2) water, and back-peddled in order to make its year end numbers match. Con-gress could not have intended to give Interior the discretion to erode the 800,000 AF number in this manner, nor does the plain meaning of the Act permit such a construction.

The majority appears to find solace in the post-hoc declara-tions that Interior submitted only after the litigation had started, arguing that the 2003 Guidance Memo and the 2004 Joint Letter do not necessarily foreclose the possibility that *some* water may not be charged under section (b)(2). In par-ticular, the majority points to the use of the phrase "much of

the (b)(2) water" in the 2003 Guidance Memo and what it calls ambiguous wording in the 2004 Joint Letter. Even if this were true, it does not detract from Interior's own general principle that "much of" water used pursuant to the WQCP serves section (b)(2)'s primary purposes. If Interior wanted to show that late June 2004 releases fall into a narrow exception, it must, at a minimum, provide a basis for why the water does not further a primary purpose. In attempting to show this, Interior can only turn to its post-hoc declarations.

"The Supreme Court has forbidden district courts from relying upon litigation affidavits and 'post hoc' rationalizations for agency action." *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1164-65 (9th Cir. 1998) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971)). Though an exception is carved out for situations where formal findings could be prepared to explain an agency's actions, the declarations submitted by Interior do not meet this exception. *See id.* What was submitted were declarations that attempted to explain why the water allocation categorization may have been appropriate in hindsight. The declarations do not show that—at the crucial time that Interior made those releases back in June of 2004—Interior had carefully considered whether the releases would serve a primary purpose or not, and properly counted the water on that basis. I cannot agree with the majority's conclusion that Interior's actions in accounting for the late June 2004 releases was not an abuse of discretion.

I respectfully dissent from all but the standing analysis of the majority opinion.